**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------ x

)

L.B., individually and on behalf of her  )
minor child, Kyle, proceeding under a  )   **Civ. No. 1:23-cv-8501 (RPK) (JRC)**
pseudonym,  )

)

*Plaintiffs*,  )   **AMENDED COMPLAINT**

)

v.  )   **PLAINTIFFS DEMAND TRIAL BY JURY**

)

The City of New York; Jess Dannhauser, in  )
his official capacity as Commissioner,  )
Administration for Children's Services of  )
the City of New York ("ACS"); Ariel  )
Semper, Nadine Cenord, Bernadet Jean-  )
Louis, Donna McFadden, Ana Costa,  )
Taiesha Coleman, and Leydi Taveras, each  )
individually and in their official capacity as  )
ACS Child Protective Specialists,  )

)

*Defendants*.  )

)

------------------------------------------------------ x

**PRELIMINARY STATEMENT**

1.      For almost three years, the New York City Administration for Children's Services ("ACS") and its agents have violated the constitutional rights of Plaintiff L.B. ("Ms. B") and her young son (proceeding under the pseudonym "Kyle") and have severely disrupted their family and school life by ruthlessly investigating a series of baseless reports alleging abuse and neglect. These reports are anonymously sourced and each contains similar demonstrably—and demonstrated to be—false allegations. ACS has determined each and every time that the allegations are baseless and unfounded. Nonetheless, each time the allegations were repeated, ACS violated Ms. B and Kyle's constitutional rights causing them severe and ongoing harm, distress, and anxiety.

1

2.      On three occasions, judges of the New York Family Court rebuked ACS for its conduct in investigating baseless reports against Ms. B, denied ACS's requests for court orders requiring Ms. B to provide them access to her home and Kyle, and noted that the anonymous reports made about Ms. B should be referred to law enforcement to investigate the pattern of false allegations.  ACS, however, did not relent.

3.      In fact, ACS has declared that it will not change its approach to investigating future reports made against Ms. B based on the same demonstrably false allegations.  The most recent false reports were made against Ms. B in August 2023.  Despite referral to law enforcement, the identity of the caller, or callers, remains unknown.  At any moment, the same individual or individuals are likely to repeat the same false allegations and, consistent with their actions over the past three years, ACS will again attempt to forcibly search Plaintiffs' home and body, and interrogate them, regardless of the lack of probable cause and exigent circumstances or court order. Therefore, absent action by this Court, Defendants will continue to harass Plaintiffs in violation of their constitutional rights.

4.      ACS has a widespread policy and custom of employing coercive tactics in its investigations, including coercing consent to home searches by falsely stating that such searches are required and interrogating children at school without parental knowledge or consent when access to the home is denied, without a court order or exigent circumstances.  ACS caseworkers and investigators used these tactics over and over again during their investigations of Ms. B.  These tactics have been documented in the media and alleged in other court proceedings.

5.      ACS's conduct amounts to violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution.  Plaintiffs bring this Complaint pursuant to 42 U.S.C. § 1983 and seek injunctive and declaratory relief and damages to redress the deprivation, under color of state law, of rights secured to them under the Fourth and Fourteenth

Amendments. Consistent with these rights, Plaintiffs request that the Court enjoin Defendants from further entering and searching Plaintiffs' home, interrogating Plaintiffs, and examining Kyle's body without a court order supported by probable cause of abuse or neglect.

## JURISDICTION

6.      Jurisdiction is conferred upon this Court by 28 U.S.C. § 1343, which provides for original jurisdiction over all actions brought pursuant to 42 U S.C. § 1983, and by 28 U.S.C. § 1331, which provides jurisdiction over all cases brought pursuant to the Constitution and laws of the United States.

## VENUE

7.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c) as a substantial part of the events or omissions giving rise to the claims occurred in this District and Plaintiffs are residents of this District.

## EXHAUSTION

8.      No exhaustion requirement applies to Plaintiffs' complaint. *See Patsy v. Board of Regents of the State of Florida*, 457 U.S. 496, 501 (1982).

## PARTIES

9.      Plaintiff L.B. is the mother of Child Plaintiff, Kyle. Ms. B has been the primary caretaker and custodian of Kyle since he was born, and they have lived together in the same apartment for over nine years. Ms. B also has two adult daughters. Ms. B is and was, at all relevant times, a resident of Kings County, State of New York.

10.     Child Plaintiff Kyle was born in 2013 and has lived with his mother, Ms. B, since he was born. He attends a selective program for gifted children in a public elementary school in Brooklyn, New York. Kyle resides in Kings County, State of New York.

11.     Defendant City of New York is a municipal entity organized and incorporated under the laws of the State of New York.

12.     Defendant Jess Dannhauser is the Commissioner of ACS, which is an agency of the City of New York.  This action is brought against him in his official capacity.  ACS is headquartered at 150 William Street, New York, NY 10038.  Defendant Dannhauser and Defendant City of New York are together the "City Defendants" or "ACS."

13.     Upon information and belief, Defendant Ariel Semper is employed by ACS as a Child Protective Specialist.  This action is brought against her individually and in her official capacity.

14.     Upon information and belief, Defendant Nadine Cenord is employed by ACS as a Child Protective Specialist.  This action is brought against her individually and in her official capacity.

15.     Upon information and belief, Defendant Bernadet Jean-Louis is employed by ACS as a Child Protective Specialist.  This action is brought against her individually and in her official capacity.

16.     Upon information and belief, Defendant Donna McFadden is employed by ACS as a Child Protective Specialist.  This action is brought against her individually and in her official capacity.

17.     Upon information and belief, Defendant Ana Costa is employed by ACS as a Child Protective Specialist.  This action is brought against her individually and in her official capacity.

18.     Upon information and belief, Defendant Taiesha Coleman is employed by ACS as a Child Protective Specialist.  This action is brought against her individually and in her official capacity.

19.     Upon information and belief, Defendant Leydi Taveras is employed by ACS as a Child Protective Specialist.  This action is brought against her individually and in her official capacity.

## STATEMENT OF FACTS

**A.**     **ACS and the New York City Child Welfare System**

20.     New York statutes and regulations provide a detailed blueprint for processing reports of alleged child abuse and neglect.  N.Y. Soc. Serv. Law ("SSL") § 422 et seq.; N.Y. Fam. Ct. Act ("FCA") § 1034.

21.     The families whom ACS investigates in New York City are disproportionately Black and Latine, and the vast majority are low-income.[1]

22.     All reports in the State of New York are received by the State Central Register for Child Abuse and Maltreatment ("SCR"), a toll-free hotline operated by the New York State Department of Social Services and located in Albany, NY.  *See* SSL § 422.  Professionals and employees in the medical, social service, education and law enforcement fields are required to report if they encounter a child in the course of their employment who they have reason to suspect is a victim of maltreatment.  *See* SSL § 413.  However, the SCR also accepts reports from anyone, and members of the public are permitted to report anonymously.  *See* SSL § 422(2)(a).

23.     When a report is received by the SCR, a caseworker obtains background information about the family and a description of the alleged child maltreatment.  If the alleged acts could reasonably constitute abuse or neglect as defined in the FCA, the report is transmitted to the child protective agency of the appropriate local department of social services—in this case, ACS.  *See* SSL § 422(2)(a).

24.     Upon receiving a report, ACS must initiate an investigation of the allegations within twenty-four hours to assess the environment and safety of the child.  *See* SSL § 424(6)(a); *see also* 42 U.S.C. § 5106(a)(1) (2018).  ACS must make a determination as to the safety of the

---

[1] https://www.nyc.gov/assets/acs/pdf/data-analysis/2022/demographics-children-fy-2022.pdf;
https://familypolicynyc.org/data-brief/hotline-calls/; https://www.pnas.org/doi/10.1073/pnas.2106272118

child within sixty days of the report.  If ACS determines that the allegations are not supported by a fair preponderance of the evidence obtained during the investigation, the report will be closed as "unfounded."   SSL §§ 412(6); 424(7).   If ACS "determines that a fair preponderance of the evidence of the alleged abuse or maltreatment exists," the report will be "indicated."  SSL § 412(7).

25.     When repeated reports are made against the same family, the ACS investigator must, at the start of the investigation, "Review Prior history, recognize patterns, and create hypothesis."  Caseworker Practice Recording Template (CPRT), 21.

26.     People with indicated cases may have their status disclosed to employers, potential employers and licensing agencies, resulting in a wide range of collateral consequences.  SSL § 424-a.  They may also be precluded from becoming foster or adoptive parents.  *Id.*

27.     ACS has the option of filing an abuse or neglect petition in Family Court pursuant to Article X of the FCA at any point during the investigation, but there is no requirement that they do so, and most indicated cases do not result in court filings.[2]

28.     In 2022, more than seventy percent of all ACS investigations, and more than ninety percent of investigations resulting from anonymous reports, were unfounded.[3]  Less than ten percent resulted in court involvement, and less than three percent resulted in children being placed in foster care.[4]

---

[2] *Id.*

[3] https://www.nyc.gov/assets/acs/pdf/data-analysis/flashReports/2023/03.pdf at p. 8;
https://familypolicynyc.org/data-brief/hotline-calls/

[4] https://www.nyc.gov/assets/acs/pdf/data-analysis/2022/demographics-children-fy-2022.pdf.

**B.**     **For Almost Three Years, ACS Has Repeatedly Violated Plaintiffs' Constitutional Rights in Response to Anonymous, Baseless and Demonstrably False Reports**

29.     Ms. B and Kyle have always enjoyed a close and loving relationship.  They have always lived together, and she cares and provides for him.  Kyle looks to his mother for support and protection.

30.     As set forth in detail below, from approximately January 14, 2021 to August 20, 2023, the SCR received approximately fourteen anonymous reports against Ms. B.   ACS investigated each of these reports and determined that each one of them was unfounded.

31.     Each of these anonymous reports contained similar false claims, including that: Ms. B had additional minor children, that she worked in a strip club, that she lived with her children in a bar, and that she had minor daughters whom she sold to adults for sex.

32.     Early in the cycle of these preposterous, unsubstantiated reports, ACS determined that these and similarly outlandish claims were false and were being reported in successive calls to the SCR.  The New York City Police Department ("NYPD"), with whom ACS was in contact in connection with these anonymous reports, also determined that the allegations were baseless and declined to investigate them further.

33.     Nonetheless, each time another baseless anonymous report was made, an ACS investigator arrived at Ms. B's and Kyle's home, sometimes very early in the morning before sunrise, and demanded to enter and search the home.  The investigators told Ms. B she was required to let them in, and, therefore, Ms. B believed she had no choice but to let them enter or she risked ACS removing her son from her.  On each occasion, ACS searched her home and demanded that she answer a long list of invasive personal questions, without regard to the fact that her home had been searched and the same questions answered only a few weeks, sometimes days, prior.

34.     Each time an ACS investigator came to Ms. B.'s home, they also demanded to see Kyle and question him alone out of his mother's presence.  If he was not already awake, they insisted that she wake him.  Each time, they asked him whether his mother hit him, whether she used drugs, and whether she had sex in front of him.  During this time, he was between seven and nine years old.  These questions disturbed and traumatized him because they were about topics that he had not been exposed to prior to ACS's involvement in his life.  The ACS investigators also instructed Kyle to lift his shirt outside the presence of his mother so they could check his body for marks and bruises.  Each time Kyle was made to disrobe in front of an ACS investigator, he became scared and distraught.  As this happened multiple times, Kyle became terrified that he would be removed from his mother and his home.

35.     ACS investigators falsely told Ms. B that she was required to allow them to enter her home and to have access to Kyle.  At no point did any ACS investigator tell Ms. B that, absent a court order, they needed her consent to enter the home.  It was not until many months into this ordeal that Ms. B learned she could deny ACS entry into her home and refuse to produce Kyle for questioning.

36.     On numerous occasions, particularly after Ms. B began refusing ACS's demands to enter their home, ACS investigators also arrived unannounced at Kyle's school and interrogated him without Ms. B's knowledge or consent.  Each time, the ACS investigator demanded that Kyle be taken out of class so they could question him, and Kyle was brought to a room and interrogated.  Kyle was seven years old when these school visits began, and he did not believe he had any choice to leave these interrogations until ACS permitted him to do so.  ACS never told Kyle that he did not need to speak with them; to the contrary, they told him he had to answer their questions.  When Kyle tried to avoid speaking with ACS in a room at his school, ACS investigators cornered him in the hallway and demanded that he answer intrusive questions there.

37.     ACS investigators have also questioned Ms. B's neighbors numerous times, questioning them about her personal life and her parenting.

38.     After each and every invasive investigation, ACS correctly deemed each and every one of the anonymous reports unfounded and closed the cases.  ACS never filed an Article X abuse or neglect petition against Ms. B, nor did they seek to remove Kyle from her care.

39.     Most recently, on or around August 19, 2023, ACS continued this cycle of harassment after yet another demonstrably false report was made about Ms. B.  When Ms. B refused ACS entry into her home or access to Kyle, ACS sought a warrant based on a false report of someone claiming to be Ms. B's non-existent sister, which was denied by a Family Court judge and later withdrawn by ACS.  As with all prior reports, after violating Plaintiffs' constitutional rights and traumatizing the family further, ACS determined that the August 19, 2023 report was false and closed the investigation on or around October 6, 2023.

40.     The conduct of the ACS caseworkers and investigators who visited Ms. B's home and Kyle's school over and over again for years is consistent with ACS's policy of aggressively pursuing allegations of abuse and neglect, regardless of whether ACS has reason to believe these allegations are false, by coercing consent to home searches and, when access is denied, seizing children for interrogation at schools without parental knowledge or consent, a court order, or exigent circumstances.

41.     Absent Court intervention, if and when another false report is made against Ms. B, ACS will continue to unlawfully search and seize Plaintiffs in violation of their constitutional rights, and will continue to traumatize Ms. B and Kyle.

### 1.     *The January 14, 2021 Report and Investigation*

42.     On January 14, 2021, at around 4:45 a.m., an anonymous caller made a phone call to the SCR hotline.  The caller alleged that:

- Ms. B had multiple children under the age of eighteen;

- Ms. B would leave her children unsupervised at home, resulting in injuries to children;

- Ms. B had a partner who resided with them and sexually abused her children;

- Ms. B was aware of the sexual abuse, recorded the abuse on video, and sold them;

- Ms. B and her partner possessed machine guns in their home;

- Ms. B and her partner used crack cocaine and heroin in the presence of children; and

- Ms. B gave her children drugs to sleep.

43.     According to ACS records, the caller chose to remain anonymous and did not provide any contact information.

44.     None of the allegations against Ms. B were true.

45.     At around 5:23 a.m. that same day, two ACS investigators, including Andrea Copeland, arrived at Ms. B's home with multiple NYPD officers.  The officers arrived in a large van and drew their weapons.  They shined flashlights into the windows of Ms. B.'s first floor apartment and went around the back of the apartment building.

46.     An ACS investigator rang the doorbell.  Ms. B. came out of her apartment and opened the door to the building with her hands in the air, begging the officers not to shoot.  They told her they were there because a report had been made to ACS that she had guns in her home. The officers directed her to stay in the hallway outside her apartment while they searched her apartment, but she followed them, afraid of what might happen to her son if she waited outside. The officers saw Kyle and Ms. B.'s adult daughter, went back outside, informed ACS that her home was "clear," and left.  The ACS investigators then entered Ms. B's home without her permission.

47.     According to ACS records, the investigators observed that Ms. B's three-bedroom apartment was "clean" and "organized" with working utilities, appropriate sleeping arrangements, and an adequate amount of food.

48.     The ACS investigators discussed the anonymous allegations with Ms. B, each of which she denied.  Ms. B explained that she has only one minor child, Kyle.  Ms. B further explained that she had recently had an argument with an acquaintance on social media, which may have led that person to make a false complaint out of spite.

49.     ACS noted that Ms. B was not under the influence of any substance.  However, ACS told Ms. B that she was required to submit to a drug test.  Ms. B agreed to submit to the drug test because she believed it was required and that refusing would risk her son being taken away from her.

50.     Although Kyle was asleep, ACS also demanded to question Kyle, and told Ms. B that it was required for them to see him.  Ms. B stated that she did not wish to wake him up so early, but allowed ACS to observe Kyle for injuries.  The ACS investigators told Ms. B that they needed to see Kyle's skin and demanded that she lift his shirt while he was sleeping.  According to ACS records, the investigators did not observe any physical injuries on Kyle's body and noted that Kyle appeared happy, clean, and well cared for.

51.     Later that day, at around 4:30 p.m., an ACS investigator, Defendant Ariel Semper, arrived at Ms. B's home again and demanded she be allowed to question Ms. B, Ms. B's adult daughter, and Kyle.  Defendant Semper told Ms. B that she was required to let her into the apartment to question them, and threatened legal action against Ms. B if she did not let ACS inside.  Ms. B was intimidated and terrified.  Believing that she had no other choice, and fearing that if she did not agree ACS could remove Kyle from the home, Ms. B permitted Defendant Semper inside the apartment.

52.    Once inside Ms. B's home, Defendant Semper stated that she had to see and question Kyle alone.  Ms. B believed that she had no choice but to permit Defendant Semper to question Kyle.  Defendant Semper then interrogated Kyle, outside of the presence of Ms. B or his older sister.  According to ACS records, Kyle stated that he feels safe in the home and is not afraid of anyone in the home, and that nothing has happened that makes him feel uncomfortable.  During this interrogation, Defendant Semper instructed Kyle to lift his shirt so that she could see his torso. According to ACS records, Kyle had no marks or bruises, and his needs appeared to be met.

53.    After interrogating Kyle, Defendant Semper directed Ms. B and Kyle to ride in a car with an ACS investigator to the "Child Advocacy Center" ("CAC") located in Brooklyn, NY. The CAC, a facility designed to investigate allegations of sexual abuse or severe physical abuse, is located inside a police station.  Ms. B was told that she had to go to the CAC.  Believing that they had no other choice, Ms. B and Kyle went with Defendant Semper, accompanied by an adult daughter of Ms. B.  Ms. B had to call her employer to report she would be missing work.  At no point over the course of her interaction with Defendant Semper did Ms. B feel that she could refuse any of Defendant Semper's instructions nor did Ms. B feel that she was at liberty to leave or to refuse to permit Defendant Semper to detain and question Kyle.

54.    At the CAC, Defendant Semper told Ms. B that Kyle would have to be questioned by a "Clinical Forensic Specialist" from the CAC and that Ms. B would need to be questioned by an NYPD detective.  Ms. B did not believe she had a choice but to submit to these interrogations.

55.    Ms. B and her adult daughter asked to be present when Kyle was questioned, but Defendant Semper said that only Ms. B's daughter could be present.  However, Ms. B. later learned that Kyle and Ms. B's daughter were separated in the interrogation rooms and that, despite her initial refusal and request to the contrary, multiple NYPD detectives questioned Kyle alone about whether he was being abused by his mother, in a room equipped with cameras pointed at him.

ACS observed this interrogation.   When Kyle emerged from the interrogation, he was visibly distraught and said he wanted to leave right away.

56.     Multiple NYPD detectives also questioned Ms. B at the CAC while ACS observed. She again denied all allegations of sexual abuse or neglect towards her children, or drug use.  ACS again demanded that Ms. B submit to a drug test, and Ms. B again agreed to do so, believing that she had no other choice.

57.     According to ACS records, after questioning Ms. B, her adult daughter, and Kyle, ACS concluded that the threat of harm to Kyle was "low," and that Ms. B ensures there is "always proper supervision."

58.     Despite having already concluded that the threat of harm to Kyle was low and that the allegations against Ms. B were false, on January 15, 2021, at or around 12:00 p.m., Defendant Semper made another unannounced visit to Ms. B's home.  Defendant Semper told Ms. B that she was required to let her in to observe the home and Kyle in connection with the investigation.  Ms. B complied because she did not know, and was not told, that she could deny ACS entry.  She was still terrified that ACS would take Kyle away if she denied their demand to enter.

59.     On January 19, 2021, Defendant Semper contacted Ms. B and requested her to submit to a drug test on January 25, 2021.  Ms. B complied, believing that she had no other choice.

60.     On January 29, 2021, ACS received the results of Ms. B's drug test.  The result was negative for all substances.  Despite this result, ACS insisted that Ms. B continue to submit to random drug testing.

61.     On January 30, 2021, ACS received a second anonymous call regarding Ms. B. The anonymous caller repeated the demonstrably false allegations made on the January 14, 2021 call, including that Ms. B was abusing her two minor children—a fact that ACS had already

investigated and found baseless as documented in their records and that was demonstratively false as she only had one minor child.

62.     On February 1, 2021, at around 2:05 p.m., Defendant Semper contacted Ms. B via a video app and demanded to speak to Kyle and her adult daughter, each outside of Ms. B's presence.  Ms. B complied, believing that she had no other choice.  During the video call, Kyle denied that anything happened that made him feel uncomfortable, or that he was fearful of anyone in the home or any family visitors to the home.  Defendant Semper instructed Kyle to make visible on the video his face, arms, legs, and bare torso, and she confirmed that there were no marks or bruises.  Kyle felt violated by having to lift his shirt for a stranger.

63.     On the morning of February 2, 2021, Defendant Semper visited Ms. B's home for the *fourth* time and told Ms. B that she was required to let her inside the home again in connection with the investigation of the anonymous report.  Although Kyle was attending school remotely at that time, and was in the middle of class, Defendant Semper demanded that he be taken out of class and to speak with Kyle outside of Ms. B's presence.  Defendant Semper told Ms. B that she was required to comply with her demands.  Ms. B agreed, believing that she had no other choice.

64.     While alone with Kyle, Defendant Semper asked Kyle about alcohol and Ms. B's drinking habits.  Defendant Semper also demanded that Kyle lift his shirt again so that she could observe his bare torso.

65.     According to ACS records, ACS noted internally on February 2, 2021 that Kyle was the only child in the home, that there was no other minor child as alleged in the anonymous reports, and that ACS had "no noted concerns as to the child [Kyle.]"

66.     As a result of the ACS investigation into Ms. B, in February 2021, Ms. B was suspended from her employment.  Ms. B's employer told her that she could come back only if ACS concluded that the allegations were unfounded.

67.     On the afternoon of February 25, 2021, despite having found nothing to substantiate the demonstrably false reports made against Ms. B, Defendant Semper conducted ACS's *fifth* visit to Ms. B's home, demanded to enter the home, and demanded to speak with Kyle.  Again, Ms. B agreed, believing that she had no other choice because Defendant Semper told her that she was required to let ACS inside and did not tell her that she could refuse entry into her home or production of her seven-year-old son for continued body checks and questioning.  During the visit, Ms. B disclosed that she was suspended from her position, and pleaded that ACS complete the investigation as quickly as possible.  Defendant Semper again questioned Kyle and examined his body, and confirmed that there were no marks or bruises.  At the end of the visit, Defendant Semper demanded that Ms. B make herself available for a telephone examination the next day, and Ms. B complied, believing that she had no other choice and wanting to bring the investigation to an end.

68.     On March 4, 2021, at around 6:30 p.m., Defendant Semper conducted ACS's *sixth* visit of Ms. B's home in three months, told Ms. B she had to let Defendant Semper search the home, and demanded to speak with Kyle.  Again, Ms. B complied, believing that she had no other choice.  During the visit, Defendant Semper questioned why Kyle had not seen his primary care physician since July 2019.  Ms. B stated that Kyle was healthy, up to date on vaccinations, and had no underlying conditions that required a visit.  ACS again questioned Kyle and observed his arms, legs, and torso, and confirmed that there were no marks or bruises.

69.     According to ACS records, on March 5, 2021, after an extended investigation, consisting of multiple searches of Ms. B's home, repeated questioning of Ms. B, her adult daughter, and Kyle, conducted by ACS investigators and law enforcement officers, at their home and at the CAC, and additional questioning of Ms. B's extended family members, former relationship partner, friends, neighbors, Kyle's primary care physician and school staff, ACS concluded that the allegations against Ms. B were unfounded and closed the investigation.  ACS

records further noted that Ms. B was "communicative" and "able to meet the concrete and emotional needs of her children," and that the family was "closely bonded."

### 2. The April 9, 2021 Report and Investigation

70.     On the morning of April 9, 2021, an anonymous caller made another demonstrably false report to the SCR hotline that repeated the allegations against Ms. B that ACS determined were unfounded only one month prior. The anonymous allegations again included that there were multiple minor children at Ms. B's home, which ACS already knew to be false.

71.     Later that day, ACS investigator Defendant Nadine Cenord arrived unannounced at Ms. B's apartment building. This was ACS's *seventh* visit to Ms. B's home in four months. Defendant Cenord first knocked on the door of Ms. B's neighbor, who said she had no concerns for Ms. B's child.

72.     Defendant Cenord next went to Ms. B's apartment, informed her that there had been another report, that she was required to let ACS inside, and that she had to speak with Kyle. Again believing that she had no other choice, Ms. B agreed to the demands.

73.     In the apartment, Defendant Cenord questioned Kyle outside of Ms. B's presence, and, according to ACS records, found that he was "happy and comfortable." Defendant Cenord examined Kyle's body, including arms, stomach, legs and thighs, and found no marks or bruises. ACS's own records from that day also noted that the anonymous report "appears to be malicious" and that ACS "has not been able to identify[sic] the safety concerns mentioned in the report."

74.     According to ACS records, when contacted by ACS, NYPD declined to investigate the repeated allegations, stating that the "exact same allegation" was previously investigated and that the prior investigation was closed without any finding. NYPD also confirmed that Kyle was the only minor child in Ms. B's home, which ACS already knew.

75.     On April 27, 2021, at approximately 3:00 p.m., Defendant Cenord arrived unannounced to Ms. B's home again and demanded to see Kyle.  This was ACS's *eighth* visit in four months.  Ms. B complied, again believing that she had no other choice because Defendant Cenord said it was required for ACS to go inside and speak with Kyle.  During his interrogation, Kyle stated that he was doing fine.

76.     According to ACS's own records, as of May 5, 2021, ACS had determined that there was no evidence to support the allegations made against Ms. B. and that Kyle appeared safe.

77.     Despite this determination, ACS continued to demand entry into Ms. B's home and to question Kyle.

78.     On May 12, 2021, at approximately 2:00 p.m., Defendant Cenord arrived unannounced to Ms. B's home again, for ACS's *ninth* visit in five months.  This time, Ms. B was at work, and ACS proceeded to question Ms. B's adult daughter and Kyle without Ms. B's knowledge or consent.  Defendant Cenord told Ms. B's adult daughter that she had to let ACS inside and threatened to take action against Ms. B if she did not comply.  Ms. B's adult daughter let Defendant Cenord inside because she feared that ACS would take Kyle away if she denied ACS entry.  Defendant Cenord questioned Ms. B's adult daughter and Kyle, outside of Ms. B's presence and without Ms. B's consent, examined Kyle's body, and noted in ACS records that Kyle was well, with no marks or bruises.

79.     On May 24, 2021, ACS concluded that the April 9, 2021 allegations against Ms. B were once again unfounded, and closed the investigation.

80.     Due to ACS's continued investigations, which made it impossible for Ms. B to do her job, Ms. B was terminated by her employer.  She was out of work for months.

### 3.    *The August 21, 2021 Report and Investigation*

81.    On August 21, 2021, an anonymous caller made yet another report to the SCR hotline that repeated similar false allegations against Ms. B that ACS knew to be unfounded, including allegations of abuse against two minor children when Ms. B had only one minor child.

82.    ACS Supervisor Keisha Kirby immediately noted on ACS's records that there had been two recent investigations of similar allegations against Ms. B.

83.    Despite clear ACS records demonstrating the complete and utter lack of any factual basis for the most recent allegations, ACS continued to force entry into Ms. B's home without valid consent and continued to investigate Ms. B and her son.

84.    At approximately 11:55 p.m. on August 21, 2021, ACS investigator Alexander Battle, Jr. arrived at Ms. B's apartment building and attempted to enter Ms. B's home.

85.    Mr. Battle was unaware of Ms. B's apartment number, and rather than obtain the number from records of ACS's numerous prior visits, proceeded to ring the bells of all of the apartments in the building, despite it being midnight.  As Ms. B was attending an event outside of the home, and had made arrangements for Kyle to stay with a family member, there was no response when Mr. Battle rang Ms. B's doorbell.

86.    The next day, August 22, 2021, at approximately 1:00 p.m., ACS investigator Defendant Bernadet Jean-Louis visited Ms. B's home.  Defendant Jean-Louis rang the doorbell without disclosing her identity, and demanded that Ms. B open the door.

87.    Upon learning that another ACS investigator had come to question Ms. B and Kyle regarding the same, demonstrably false allegations, Ms. B expressed her frustration, explaining that she had already been questioned multiple times that year.  At this point, Ms. B had heard from colleagues at her new employer that she could refuse to let ACS inside her apartment and did not have to cooperate with ACS.  Based on what she heard from her colleagues, Ms. B told Defendant

Jean-Louis that she did not need to let ACS inside.  Defendant Jean-Louis persisted, however, and stated that ACS was required to search the home and see Kyle.  Defendant Jean-Louis threatened Ms. B that ACS would take action against her in court to get access to her home and Kyle, and that the only way to make ACS stop visiting was to let them inside the home.  Intimidated by ACS, knowing the power ACS had to remove children from their parents, and terrified of ACS's threats of legal action, Ms. B reluctantly agreed, believing that she had no real choice and that refusal risked her being separated from Kyle.  Ms. B provided details of the prior ACS investigations, including the names of the prior investigators, and pleaded that Defendant Jean-Louis review the ACS records and close the investigation as quickly as possible.  Defendant Jean-Louis stated that, to do so, Ms. B's cooperation was required.

88.     Once inside the apartment, Defendant Jean-Louis searched the home.  According to ACS records, Defendant Jean-Louis found that there was ample food in the refrigerator, and "did not observe anything that might place the child at risk or in danger."

89.     When Ms. B explained that Kyle was with a family member and would be returning home later that day, Defendant Jean-Louis demanded that Ms. B call the family member immediately so that she could see and question Kyle on video.  Ms. B agreed to the demand, believing that refusing to do so would risk Kyle being taken away.  During the video call, Kyle stated that he was never left alone, and that he is not afraid of any visitors in his home.

90.     Despite having questioned Kyle on video and found no evidence in support of the allegations, Defendant Jean-Louis continued to demand that she be allowed to see and question Kyle, on video, when he returned home that day.  Again, Ms. B agreed, believing that she had no choice, and that should she fail to cooperate, Kyle could be taken away from her.  Ms. B was not informed by Defendant Jean-Louis, or anyone at ACS, that she had the right to refuse entry into her home or production of her son to ACS.

91.     Despite ACS records from prior investigations clearly indicating that Kyle was the only minor child in Ms. B's home, Defendant Jean-Louis proceeded to question Ms. B's adult daughter regarding her age and the presence of other children in the home.  Ms. B's adult daughter confirmed that she was over eighteen years old, and that she had no children, just as she had done numerous times that year.

92.     Only after again conducting a search of Ms. B's home and questioning Ms. B, her daughter, and Kyle on video, Defendant Jean-Luis contacted the prior ACS investigator, Defendant Semper, to learn about the prior investigations.  According to ACS records, the two investigators spoke via phone on the afternoon of August 23, 2021, and Defendant Semper confirmed that the prior case against Ms. B was unfounded.

93.     Upon Kyle's return home, at approximately 8:00 p.m. that day, Ms. B permitted Defendant Jean-Louis to question Kyle via a video call, for the second time that day.  During the call, Kyle stated once again that he was not afraid of anyone who lives in or visits his home. Defendant Jean-Louis stated that Kyle was required to show her his body, and demanded that Kyle lift up his shirt and raise his pants.  Defendant Jean-Louis once again confirmed that there were no marks or bruises.

94.     On August 25, 2021, at approximately 10:30 p.m., Defendant Jean-Louis contacted Ms. B via phone.  During the call, Defendant Jean-Louis reiterated that Ms. B's cooperation was required for ACS to complete the investigation.

95.     On August 30, 2021, at approximately 4:45 p.m., Defendant Jean-Louis returned to Ms. B's home again and demanded that Ms. B let her inside, stating again that it was required. This was the *twelfth* ACS visit to Ms. B's home that year.  Ms. B agreed, again, because ACS had threatened legal action against her if she denied them entry and she feared that refusing Defendant Jean-Louis's demand would lead to Kyle being taken away.  During the visit, Defendant Jean-

Louis again questioned Kyle and demanded to observe his body, noting that there were no marks or bruises.

96.     On or around September 3, 2021, ACS received yet another anonymous report that repeated the same, demonstrably false allegations.  This time, the allegations included that Ms. B burned her children with cigarettes.

97.     At approximately 6:45 p.m. on September 3, 2021, Defendant Semper visited Ms. B's home unannounced.  This was the *thirteenth* ACS visit to Ms. B's home that year.  Defendant Semper told Ms. B that she had to let Defendant Semper enter the home, and Ms. B complied, believing that she had no real choice.

98.     Defendant Semper demanded to question and examine Kyle's body again. Defendant Semper asked Kyle whether anything happens in his home that makes him feel scared or uncomfortable, or whether he was ever burned with a cigarette.  Kyle said no.  Defendant Semper examined Kyle's body and confirmed that there were no marks, bruises, or burns.

99.     Defendant Semper also searched the home, and noted that the home was clean and tidy, stocked with adequate food, and that there were no safety concerns.

100.    Almost three weeks later, on September 22, 2021, Defendant Jean-Louis again visited Ms. B's home, unannounced.  This was ACS's *fourteenth* visit to Ms. B's home that year. Defendant Jean-Louis demanded entry to the home, told Ms. B that it was required, and stated to Ms. B that the only way for the case to be closed in less than sixty days was for her to allow ACS access.

101.    Ms. B agreed, again believing that she was required to do so, and desperately hoping to bring the investigation to a close as quickly as possible.

102.    While Ms. B was on the phone, Defendant Jean-Louis questioned Kyle alone.  Kyle again denied having any issues at home.  Defendant Jean-Louis examined Kyle's body and noted that there were no marks or bruises or burns, including on his arms, legs, chest and back.

103.    According to ACS records, on September 23, 2021, ACS held an internal conference regarding the case, and once again determined that the allegations against Ms. B were unfounded.  According to ACS records, ACS determined that the reports were inaccurate and malicious, and that Kyle was "well-cared for."

104.    Despite this determination, ACS continued to investigate Ms. B, to demand entry to her home, and to question her and Kyle, insisting each time that ACS be permitted to conduct a body check of Kyle.

105.    On October 15, 2021, at approximately 6:40 p.m., Defendant Jean-Louis again visited Ms. B's home unannounced.  This was ACS's *fifteenth* visit to Ms. B's home that year.  Although Ms. B and Kyle were not home, Defendant Jean-Louis contacted Ms. B, who agreed to meet her at a nearby location.  Defendant Jean-Louis proceeded to question Kyle on the street.  After questioning Kyle, she also demanded that she be allowed to inspect Kyle's body, and search their home.  Ms. B stated that she did not want Kyle's body to be inspected in public, and agreed to have a video call with Defendant Jean-Louis once they returned home.  Not once was Ms. B informed that she did not have to comply with ACS's demands to submit her child to questioning and a body check.

106.    According to ACS records, on October 19, 2021, ACS again determined that the reports against Ms. B were unfounded.  ACS records note that there was no evidence gathered to support the allegations, and that "the family is well known to the agency" due to the history of unfounded reports.

### 4.      *The February 6, 2022 Report and Investigation*

107.     On February 6, 2022, shortly after midnight, an anonymous caller made yet another false report to the SCR hotline that repeated allegations ACS knew to be unfounded and demonstrably untrue.  By this point, in response to past unfounded reports, ACS had interrogated Ms. B and Kyle, who was now eight years old, more than *fifteen* times and had searched their home more than *ten* times in twelve months, concluding each time that Kyle was well cared for and safe.

108.     This new anonymous report alleged that Ms. B was living in a bar with her six-year-old son and two daughters aged seven and eight (children that ACS knew did not exist); that she frequently drank to the point of intoxication, left her children alone, and hit them with pots and pans, punched them in the face and burned them with cigarettes causing cuts, bruises and burns; that she and an unrelated adult caretaker named "John" were selling guns and that she was permitting him to force the nonexistent children to perform oral sex; and that she was "hiding" her children at the address ACS knew to be the family's home.

109.     Even though ACS knew that multiple false anonymous reports with similar allegations had been made against Ms. B in the past, that she had only one minor child, and that Kyle was properly cared for, they once again aggressively investigated the family and terrorized Kyle.

110.     At approximately 3:00 a.m. on February 6, 2022, ACS investigator Defendant Donna McFadden arrived at an event space where Ms. B was celebrating her birthday with her two adult daughters.  Ms. B. vehemently denied the allegations and explained, again, that she was being harassed by someone calling in false reports.  She explained that Kyle was at her home with an adult cousin who was babysitting him.

111.    At approximately 4:00 a.m., Defendant McFadden arrived at Ms. B's home, told Ms. B's cousin that she was required to search the home and see Kyle, and demanded that Ms. B's cousin allow her to enter the home.  ACS did not request permission from Ms. B.  This was ACS's *sixteenth* visit to Ms. B's home in thirteen months.

112.    Ms. B's cousin let Defendant McFadden inside because he believed he had no other choice, and Defendant McFadden proceeded to question Ms. B's cousin.  The cousin confirmed that Ms. B only had one minor child, which ACS already knew, and stated that he had no concerns with her parenting.  Defendant McFadden then demanded that he wake Kyle so she could interrogate him.  According to ACS records, Defendant McFadden could not question Kyle, who was sleeping soundly.  Defendant McFadden approached Kyle in bed and reached to take the blanket off of him, but the cousin intervened and told her to stop and not touch the child while he was sleeping.  According to ACS records, Defendant McFadden observed that Kyle was fine with no marks or bruises, and she did not see anything in the home that concerned her.

113.    Later in the day, NYPD Detective Charles arrived at Ms. B's home, demanding to see Kyle.  Detective Charles interrogated Kyle, who told the detective everything was okay and that he was not being physically disciplined.  The detective told Kyle to lift up his shirt and took a photograph of his bare torso, which greatly distressed Kyle.  According to ACS records, Kyle had no marks or bruises, and the detective later reported to ACS that he did not see anything in the home that concerned him.

114.    The following evening, on February 7, 2022, ACS investigator Defendant Ana Costa arrived at Ms. B's home and rang the doorbell.  This was ACS's *seventeenth* visit to Ms. B's home in thirteen months.  When there was no answer, Defendant Costa called Ms. B on the phone and told her that she needed to enter and "clear" her home, even though she knew that the home had been searched and cleared by both Defendant McFadden and NYPD the day before.

115.    Exhausted by ACS's harassment, Ms. B told her she did not consent to another search of her home—the third in two days.  Defendant Costa then told Ms. B that she was, therefore, required to bring Kyle back to the CAC for him to be interrogated and examined again.  Ms. B refused to allow Defendant Costa to enter the home and question Kyle or to agree to bring Kyle to the CAC without a court order.  At this point, Ms. B wanted ACS to bring her to court so that she could plead her case before a judge even though she was still terrified that ACS would try to take Kyle away.

116.    The next morning, February 8, 2022, at 8:30 a.m., Defendant Costa went to Kyle's school to interrogate and examine him outside of his mother's presence and without her consent.  Defendant Costa demanded that the school remove Kyle from his class, and he was taken to the school's main office.  Kyle was told that he had to stay and answer Defendant Costa's questions.  Defendant Costa proceeded to interrogate Kyle in the school office for approximately five to ten minutes.  Defendant Costa did not tell Kyle who she was, nor did she ask the school to call Ms. B.  She never offered that Kyle could call his mother or told him that he was free to leave.  Kyle felt as though he had no choice but to stay and answer Defendant Costa's questions until he was permitted to leave.

117.    Defendant Costa knew that the NYPD had already questioned Kyle about the most recent report, including photographing him unclothed, and had found no cause for concern.  Moreover, ACS had already interrogated him and examined his body numerous times in the past year, and found no cause for concern.  Nonetheless, Defendant Costa once again asked Kyle distressing and intrusive questions about his home life, including whether Ms. B took drugs and whether there were adults fighting in the home.

118.    In response to this questioning, Kyle said he felt safe and comfortable at home. According to ACS, Defendant Costa observed no marks or bruises on Kyle.  School staff told Defendant Costa they had no concerns about Ms. B's parenting of Kyle.

119.    After the interrogation, Kyle was so distraught that the school had to call Ms. B to pick him up early.  Ms. B immediately left work and came to care for Kyle.

### 5.    February 8, 2022 Family Court Proceeding.

120.    Later in the day on February 8, 2022, ACS filed a petition in Kings County Family Court pursuant to FCA § 1034 seeking a warrant to enter Ms. B's home "at any hour" and a court order requiring Ms. B to bring Kyle back to the CAC by 7:00 p.m. the following day, even though ACS had already visited and seen Kyle at the home two days earlier.  ACS omitted important facts from the petition.  They did not mention that the allegations against Ms. B were anonymous, and they omitted the allegation in the underlying report that Ms. B had two other minor children, which ACS knew to be false.  ACS also omitted that it had interrogated Kyle that same morning at his school and examined his body, and found no cause for concern.

121.    In court on February 8, 2022, where Ms. B was represented by counsel from Brooklyn Defender Services ("BDS") for the first time, ACS admitted that it had previously investigated multiple anonymous reports against Ms. B and had concluded that all of them were unfounded.  ACS admitted that its investigators had seen and assessed Kyle twice over the previous two days, and that an NYPD detective had recently visited the home, questioned Kyle, and taken photographs of his body showing he had no marks or bruises.

122.    The Family Court judge not only denied ACS's warrant application, but also directed ACS not to question Kyle regarding the most recent report and expressed her concern about ACS's conduct in investigating reports against Ms. B.

26

123.    The Family Court judge stated that she understood that ACS has "rules," "but they have to be adjusted when . . . following them is more likely to do harm than uncover any concern." The judge explained that "showing up in the middle of the night is traumatic; taking off kids' clothes is traumatic."  She described Ms. B as "a mother who's trying to avoid her son going through more trauma than it sounds like he's already been through."

124.    The Family Court judge also ordered that ACS refer the case to the Kings County District Attorney for potential prosecution of the malicious reporting, and ordered ACS "not only [to] end this investigation but that . . .  internally there be some . . . note to the electronic file that if subsequent calls are made they are to be treated very carefully, because this child has already suffered trauma."  She pointed out that going to see a child at school can be traumatic, and asked the agency to "be more thoughtful and not choose to go to a school" unnecessarily.

125.    At the conclusion of the hearing, Defendant Costa asked for permission to see Kyle every two weeks. The judge responded, "You're coming back next week, so you won't need to see him before then."

126.    The Family Court judge adjourned the case to February 15, 2022 to address her concern about future investigations continuing to traumatize Kyle.

127.    In an order dated February 8, 2022, the Family Court ordered that: "The Subject Child is NOT to be interviewed again by ACS regarding this allegation"; that if a new allegation is made, "ACS is to proceed cautiously and gently to investigate in a way that will minimize any further trauma to the Subject Child"; and that ACS "refer this matter to the District Attorney's office to investigate the pattern of false allegations."

128.    On February 9, 2022, traumatized by ACS's multiple interrogations of him, Kyle refused to go to school out of fear of being interrogated again by ACS.

129.    ACS did not respect the Family Court's February 8, 2022 order.  Later that same day, Ms. B received a missed call.  When she called the number back, an ACS investigator demanded to speak to Kyle by Facetime and to see Ms. B's refrigerator to check whether there was food.  Ms. B refused, citing the Family Court's order.

130.    On February 15, 2022, during the follow-up appearance in Family Court, ACS's counsel reported that it had provided the District Attorney's office with information about the case, but had no further updates.  The Family Court noted its prior order in which it asked that ACS take history into account if it gets a new report, and asked again that ACS do so.

131.    ACS did not abide by the Family Court's request.

132.    According to ACS records, on February 24, 2022, another anonymous call making similar allegations was made against Ms. B.  Later that day, at 7:20 p.m., Defendant Costa arrived at Ms. B's address and attempted to obtain access to Ms. B's home.  Defendant Costa called Ms. B, who stated that she was not allowing ACS to enter the home and would not bring Kyle to the door, and restated her concerns that ACS's conduct was terrifying Kyle.

133.    The following day, at 5:30 p.m., Defendant Costa again went to Ms. B's home and rang the doorbell, and called Ms. B.  Nobody answered the door and Ms. B did not answer the phone.

134.    The next day, at 4:46 p.m., another ACS investigator, Shelley Williams, went to Ms. B's home, rang the doorbell, and called Ms. B.  Nobody answered the door and Ms. B did not answer the phone.

135.    The next day, February 27, 2022, at around 2:44 a.m., another ACS investigator, Chiffon Johnson-Featherstone, went to Ms. B's home again.  Ms. Johnson-Featherstone forced her way into the building when someone else opened the door.  When Ms. Johnson-Featherstone rang Ms. B's doorbell, Kyle's uncle answered the door.  Ms. B was not home.  Despite the Family Court

having ordered ACS not to question Kyle again in connection with the February 6, 2022 report, and the court order stating that ACS should "proceed cautiously and gently" on any future investigations to avoid trauma to Kyle, Ms. Johnson-Featherstone demanded that Kyle come to the door to be examined.  She told Kyle's uncle that it was required.  Kyle's uncle refused to permit Ms. Johnson-Featherstone to enter the home but brought Kyle to the door, where Ms. Johnson-Featherstone observed him to be free of any marks or bruises.

136.    The next day, February 28, 2022, at 8:35 a.m., ACS again went to Kyle's school to interrogate Kyle without Ms. B's knowledge or consent, despite the Family Court order indicating that a school visit should only be conducted where necessary, and despite ACS having observed Kyle only six hours earlier.  On information and belief, Defendant Costa demanded that school administrators produce Kyle for questioning, the school removed Kyle from class and told him to go to the school's main office, and Defendant Costa interrogated Kyle in the school's main office about topics such as his mother's drinking habits—which ACS had repeatedly asked him about in the past.  Kyle was told that he was required to submit to the interrogation.  Defendant Costa never offered that Kyle could call his mother and never told him that he did not need to answer her questions.  Kyle only stayed and answered Defendant Costa's questions because Kyle did not believe he had a choice or that he would be permitted to leave the interrogation.

137.    After discovering that ACS had interrogated Kyle at school again, Ms. B told Kyle that he did not have to speak with ACS investigators, and could walk away.

138.    On March 4, 2022, at 10:56 a.m., Defendant Costa went to Kyle's school to question him, for the third time since February 8, 2022.  On information and belief, Defendant Costa again asked school administrators to produce Kyle for questioning, and the school removed Kyle from class.  On his way to the school's main office, when Kyle saw Defendant Costa again and recognized her, he ran back to class.

139.    According to ACS records, on March 7, 2022, ACS determined that the anonymous February 2022 reports against Ms. B, like the prior reports against her, were unfounded.

### 6.    *June 26, 2022 Report and Investigation*

140.    ACS's harassment and abusive investigations against Ms. B and Kyle continued even after the first intervention by the Family Court.

141.    On or about June 26, 2022, ACS received an anonymous report about a father sexually abusing two minor daughters.  The allegations did not mention Ms. B or Kyle.

142.    Nonetheless, on June 26, 2022, at approximately 4:00 a.m. and again at 6:00 a.m., Ms. B received phone calls from ACS investigator Shakera Fowler, notifying her that a new report had been made to the SCR, that the case was not against her and did not contain any allegations against her, but that she was unfortunately "somehow connected" to the unrelated man in the ACS database, which possibly led to her name being added to the report.

143.    When Ms. Fowler revealed that she was standing in front of Ms. B's apartment building and stated that she had to enter the home and see Kyle, Ms. B told her that she did not consent to Ms. Fowler entering the home or questioning Kyle, and that Ms. Fowler had to leave, referencing the February 8, 2022 Family Court Order.

144.    Later that day, at approximately 4:45 p.m., another ACS investigator, Trisha Blair, appeared in front of Ms. B's home and demanded entry, stating again that ACS had to enter the home and see Kyle.  Ms. B once again told Ms. Blair that she did not consent to a search, referencing the Family Court Order.

145.    The next day, June 27, 2022, ACS investigator Defendant Taiesha Coleman went to Kyle's school, and attempted to interrogate him again without Ms. B's consent or knowledge.

146.    Kyle was removed from class by the school and sent to speak with Defendant Coleman in the school's main office.  Kyle did not know that he was going to meet an ACS

investigator until after he arrived at the office and Defendant Coleman identified herself. Defendant Coleman then began interrogating Kyle in the office.  Only eight years old at the time, Kyle was terrified of ACS and did not think he could leave the office until he was given permission to do so.  He told Defendant Coleman that he did not understand why she had come to his school and that ACS should leave him alone.  Defendant Coleman told him that it was required for ACS to see him and ask him questions.  Kyle was distraught that he might be removed from his mother's care and his home.  Kyle returned to class only after the interrogation was over and once Defendant Coleman permitted him to leave.

147.    When Kyle told his mother about the school visits, Ms. B told her son that he did not need to speak with or meet with ACS if he did not want to.

148.    Over the course of two days, at least four different ACS investigators called Ms. B to speak to her about the new allegations and demand access to her home.

149.    According to ACS records, on June 28, 2022, the District Attorney's ("DA") office informed ACS that the DA's office would not be investigating the June 26, 2022 report further, as it likely was a part of numerous false reports arising out of a social media dispute, and that there was not going to be an NYPD officer assigned to the case.  Nonetheless, ACS continued to demand entry to Ms. B's home and to attempt to question Kyle at home and at school.

150.    On or about July 19, 2022, Defendant Coleman appeared at Kyle's school where he was attending summer camp and tried to interrogate him.  Kyle said, "I am tired of this, I can't do this anymore," and walked away.  According to ACS, Defendant Coleman observed that he had no marks or bruises.

151.    On July 21, 2022, an ACS Supervisor, Tanya Gage, again visited Kyle at his camp, and tried to interrogate him.  On information and belief, Ms. Gage demanded that the camp remove Kyle from his activities to speak with her, the camp obliged, and Kyle was brought to the main

office to speak with Ms. Gage.  At the entrance of the office, when Ms. Gage introduced herself, Kyle refused to enter the office and speak with her and went back to his camp activities.

152.    On July 22, 2022, a social worker employed at BDS contacted Ms. Gage.  Ms. Gage said that each time a new SCR report is received, ACS will find and speak with Kyle regardless of whether Ms. B consents.

153.    According to ACS records, on July 29, 2022, the June 26, 2022 report was deemed unfounded and the case was closed.

### 7.    December 2022 Report and Investigation, and Second Family Court Intervention

154.    On or around December 28, 2022, there was another report made to ACS, this time against Ms. B and one of her adult daughters, making similar allegations of abuse against Kyle and the daughter's newborn child.  According to ACS records, an ACS investigator spoke with the person believed to be the source of the report, and that person stated that she did not call in this report, that she did not know Ms. B or her daughter, and that she had been having issues with someone using her information to call in reports against other people.

155.    On December 28, 2022, ACS investigator Defendant Leydi Taveras appeared at Ms. B's home demanding entry, stating that Ms. B had to let her inside.  Ms. B asserted her rights and did not provide consent.  Defendant Taveras saw Kyle in the hallway outside his apartment and instructed him to lift up his shirt in public.  Kyle lifted his shirt as instructed, and Defendant Taveras observed that he had no marks or bruises on his torso.  Defendant Taveras also questioned Ms. B.'s landlord.  The same day, Ms. B received an unsigned letter on ACS letterhead directing her to attend a "scheduled appointment" at the CAC the following day.  Ms. B had not scheduled any such appointment.

156.     Kyle was so distraught by the prospect of another investigation and so fearful of further interrogations by defendants that he asked his mother to dismantle the doorbell.  She did so, hoping it would keep ACS from waking him in the middle of the night.  He would wake up terrified every time he heard a noise that he thought was ACS ringing the doorbell.  On December 29, 2022, Ms. B sent him to stay with a family friend in Far Rockaway for the rest of the school winter vacation in the hopes that he would be able to relax and enjoy some of his time off without the trauma of the continued ACS investigations and body checks.

157.     On December 30, 2022, another report was made to ACS, repeating the same allegations against Ms. B and her daughter.

158.     That morning, Ms. B. received another notice from ACS, notifying her that ACS investigator Fowler had visited her home at 6:59 a.m., and demanding that Ms. B call ACS between the hours of 12:00 am and 8:00 am.

159.     Later in the morning on December 30, 2022, an NYPD detective went to Ms. B's house.  She allowed the detective to enter and showed them Kyle's bedroom and answered their questions.  The detective told her the NYPD was not planning to investigate the report because of the history of false reports against her.

160.     After the NYPD detective left, the detective called Ms. B to tell her they had spoken with ACS and let ACS know they had spoken with her and searched her home and that there was no need for ACS to do so.  The detective said ACS's response was, "We don't care.  We're still coming out."  ACS investigator Defendant Taveras arrived at her home later that day.  Ms. B did not permit her to enter her home, and explained that Kyle was not there.

161.     Later in the afternoon on December 30, 2022, ACS once again requested that the Kings County Family Court issue a warrant pursuant to FCA § 1034 to enter Ms. B's home and to force her to bring Kyle to the CAC.  The judge asked ACS how many prior reports had been called

in against Ms. B.  ACS responded that they did not know but agreed to obtain this information. The Family Court adjourned the case to January 4, 2023 without issuing any orders permitting access to Ms. B's home or her family.

162.    Even though the Family Court did not grant ACS's application, Defendant Taveras left a letter at Ms. B's home directing her to bring Kyle to the CAC on January 3, 2023, and threatening legal action in Family Court if she did not do so.

163.    Prior to the next scheduled appearance, ACS submitted to the Family Court a list of the ten unfounded reports that had been called in to the SCR against Ms. B. regarding Kyle since January 2021, not including the most recent one.

164.    On January 4, 2023, Ms. B and Kyle were present in Family Court for the continuation of the warrant application proceeding.  During the hearing, in response to the numerous unfounded reports against Ms. B, the court stated its belief that the family was being harassed and that "all indicia seems to be, as I said before, that ACS is being used as an instrument to harass Ms. B[ ] and her family."  The Family Court issued an order dismissing ACS's application to question Kyle and enter Ms. B's home and directing ACS to refer the repeated false reports to the District Attorney's office "for investigation as the number of unfounded anonymous accusations levied against the family indicates possible criminal harassment and excessive waste of state resources."

165.    After hearing the court's order, Kyle felt safer returning to school and Ms. B sent him to school, believing that ACS would comply with the court's order and stop coming to the school and traumatizing him.

166.    *The very next day*, however, on January 5, 2023, Kyle came home from school distraught and recounted that during his lunch period he was told to see the guidance counselor. When he arrived at the guidance counselor's office, two ACS investigators, including Defendant

Taveras, were there and wanted to speak with him. The door was closed. Kyle told them he wanted to go back to class, but the ACS investigators continued to ask him questions for approximately five to ten minutes. Kyle was never offered an opportunity to call his mother. He was not told that he did not need to answer ACS's questions. Kyle did not feel like he could leave the room until given permission.

167. After Kyle answered ACS's questions, the guidance counselor escorted Kyle and the investigators part of the way to the exit, which was in the same direction as the lunchroom. Kyle did not want his friends to see him with ACS, so he told the investigators he needed to get a mask from the school security guard and walked away. When he came back, the ACS investigators were waiting for him in the hallway outside the lunchroom. They stopped him, arranged themselves around him in the hallway so he could not walk away, and began asking him the same questions they usually asked, including whether his mother hits him, uses drugs, and has sex in front of him. Kyle felt cornered by these investigators and that he could not leave without answering their questions. Only when ACS was finished interrogating Kyle did they permit him to leave.

168. The guidance counselor later informed Ms. B that ACS did not tell the school about the Family Court order denying ACS's application to question Kyle.

169. When Ms. B called the ACS investigator to confront her about violating the court's order, the investigator told her that the Family Court cannot stop her from going to the school to question and examine her son, and then hung up. Ms. B, like her son, was terrified at the purported power ACS claimed to have over her and her family and their complete disregard for the court's orders to date.

170. On January 6, 2023, Ms. B's family defense counsel at BDS contacted ACS counsel and invoked Ms. B's right to have counsel present during all interactions with defendants.

35

171.    Despite the Family Court's order and BDS counsel's request, ACS investigators showed up at Kyle's school on January 19, 2023 and again on January 23, 2023, asking to speak with Kyle.  On both occasions, the investigator was informed that Kyle was not in school.

172.    Kyle was traumatized by ACS's constant harassment, and told Ms. B that he was too scared to go to school because he thought ACS would come again.

173.    According to ACS records, on January 26, 2023, ACS determined that the report against Ms. B and her daughter was unfounded and closed the investigation.

### 8.    *February 5, 2023 Report and Investigation*

174.    Early in the morning on or about February 5, 2023, ACS received another report making similar allegations that Ms. B and two others were abusing two minor children aged nine and four, which ACS knew or had reason to know were unfounded.

175.    That same day, ACS contacted the supposed "source" of the report, who then told ACS that she did not make the report and that it was not the first time she was accused of calling in reports to ACS that she never made.

176.    Two ACS investigators, Daliz Carbajal and McCoy, appeared at approximately 3:00 a.m. on February 5, 2023 outside a club where Ms. B was celebrating her birthday, without prior notice to her or her BDS counsel, and demanded to speak with her.  Ms. B refused to come outside and spoke with the ACS investigators on the phone.  Although Ms. B stated that she was not home, and despite the late hour, the investigators had attempted to force entry into the building by ringing the doorbells of Ms. B's three neighboring apartments.

177.    When Ms. B. got home, she saw that an ACS investigator had left a note for her. On February 6, 2023, she received a third note from Defendant Taveras informing Ms. B that she supposedly had an appointment at the CAC again the next day, February 7, 2023, and that it was

"important that [she] keep the scheduled appointment."  Ms. B had not scheduled any such appointment, and she did not go to the CAC.

178.   On February 7, 2023, Defendant Taveras again left a notice at Ms. B's home directing Ms. B to meet with her at the CAC the following day and that it was "important that [she] come to [the CAC] . . . tomorrow . . . at 10 a.m."  The letter also threatened legal action if she failed to comply.  This was the fourth notice left at her door in three days.  Ms. B. did not go to the CAC.

179.   When Kyle learned that ACS was trying to interrogate him again, he was terrified and told his mother that he could not breathe when he saw ACS investigators at his school.  Ms. B took him to the doctor that month, who diagnosed Kyle with anxiety.

180.   Defendant Taveras attempted to visit Ms. B's home again on February 17, 2023. She was not home, and ACS left her another letter.

181.   Another ACS investigator, Madeline Maisonave-Hern, attempted to visit Ms. B's home on February 21, 2023.  There was no response.

182.   On February 27, 2023, Defendant Taveras visited Kyle's school again.  Kyle was not in attendance because he was still terrified of being interrogated by ACS again.

183.   According to ACS records, on March 3, 2023, ACS determined that the February 5, 2023 report was unfounded and closed the investigation.

### 9. *August 19, 2023 Report and Investigation*

184.   On or about August 19, 2023, another report was made to ACS regarding Ms. B. This report alleged similar allegations from previous reports, including that Ms. B was misusing drugs and alcohol in front of Kyle and physically abusing Kyle.  On or about August 20, 2023, another report was made against Ms. B with similar allegations.

185.     Despite having received at least *thirteen* false reports against Ms. B over the past two-plus years with similar allegations that ACS determined to be unfounded, knowing that Ms. B was represented by counsel and had requested to have counsel present during all interactions with ACS, and Family Court having twice denied ACS access to the family, ACS again began aggressively investigating this new false report without contacting Ms. B.'s counsel or seeking a warrant from the Family Court.

186.     On August 19, 2023, ACS investigator Adrian Brereton went to Ms. B's address, but no one was home.

187.     On August 20, 2023, at around 3:00 a.m., ACS investigator Andrea Derrell went to Ms. B's address again, rang all the doorbells in the building, and then called Ms. B, who said she would not consent to ACS searching her home.

188.     Kyle was terrified when he learned that ACS had started another investigation.  He refused to go to the summer camp at his school the following day, and told Ms. B that he would not go for the rest of the summer, because he was nervous ACS would show up at his camp.  Ms. B had to stay home from work on August 21, 2023 to take care of Kyle.

189.     On August 22, 2023, ACS filed a petition in Kings County Family Court pursuant to FCA § 1034 seeking an order to search Ms. B.'s home and for Ms. B to produce Kyle at an ACS field office in Brooklyn, NY.  In the petition, ACS investigator Chinarka Carrington stated that she had spoken with someone purporting to be Kyle's "maternal aunt" on the morning of August 21, 2023, and that this person described the same conduct contained in the new reports.  Ms. B, however, has no siblings – this purported maternal aunt does not exist.  On information and belief, despite its own multiple prior findings that reports against Ms. B making similar allegations had been false and appeared to be malicious, ACS did not even attempt to confirm the identity of the person it relied upon in its petition.

190.    During a hearing on August 22, 2023, the Family Court refused to grant the petition, adjourned the proceedings for one week, and ordered ACS to document the identity of the purported maternal aunt referenced in the petition.  Counsel for Ms. B. clarified that the purported aunt did not exist.

191.    On August 23, 2023, despite what happened the prior day in Family Court, ACS visited Ms. B's home again.  Ms. B refused their demand to enter the home.

192.    On August 31, 2023, after apparently confirming that the person on whom ACS relied in its petition was not Kyle's aunt and had made a false report, ACS withdrew its petition.

193.    Even after withdrawing its petition because it could not show probable cause that Kyle was being neglected or abused, and with knowledge that the reports against Ms. B were false, ACS has continued to harass and violate the constitutional rights of Ms. B and Kyle.

194.    On September 12, 2023, the fourth day of the new school year, an ACS investigator visited Kyle's school again and demanded to see Kyle.  The ACS investigator told the school's administrators that it was required.  Kyle was then told by his teacher that he had to leave class and go to the school's main office to meet with the ACS investigator.  Kyle was so anxious and terrified he felt like he could not breathe.  When Kyle arrived at the office, the ACS investigator proceeded to interrogate him.  Kyle did not want to speak with ACS, but did not feel like he could leave until ACS permitted him to leave.  He remained silent until he was finally permitted to return to class after approximately five to ten minutes.

195.    On or around October 6, 2023, ACS determined that the August 19, 2023 and August 20, 2023 reports, like all others before them, were unfounded and closed the investigation.

C.    **ACS Has Caused Plaintiffs Significant Harm, and Continues to Threaten Them.**

196.    When ACS first began investigating Ms. B and her family in January 2021, she worked at a residential facility for developmentally disabled children and adults funded by the

state, Office for People with Developmental Disabilities ("OPWDD").  She loved her job and worked there for almost five years.  As a result of the ACS investigations against her, she was suspended from her job.  After the initial cases were deemed unfounded, she was reinstated, but she was eventually let go when ACS started new investigations.  She was out of work for months. Even though all of the ACS cases against her were unfounded, potential employers were notified of pending, unresolved cases, complicating her job search.  Nevertheless, she found work with a different non-profit in a day habilitation program also funded by OPWDD.  She likes the job but the pay is less, and, unlike at her prior job, she does not receive benefits.

197.    Kyle told his mother he did not feel safe at school because neither the Family Court nor the school could protect him from ACS.  He felt that his mother was the only one who could protect him.  On several occasions, Kyle went to the school nurse who then called Ms. B asking her to come pick him up from school because he was so upset by the ACS investigations, he was having chest pain and difficulty breathing.

198.    Kyle used to love to go to school.  Every time ACS showed up demanding to interrogate him, he would be forced to miss portions of his classes disrupting his education.  Every time ACS visited school, he was afraid he might be removed from his mother.  Now, his fear of ACS has taken away the joy he felt at school.  He told his mother that he wanted to move and change schools.  Ms. B is reluctant to take him out of his highly selective and well-regarded program, and she fears that whatever school he goes to, ACS will find him.

199.    Ms. B reasonably expected that school would be a safe place for instruction and learning for Kyle.  Instead, due to ACS's relentless seizures and interrogations of Kyle, school has become a frightening place where Kyle could not obtain the education he and Ms. B expected.

200.    Since ACS began investigating Ms. B, Kyle has been waking up in the middle of the night whenever he hears the slightest noise.  He often jumps out of bed, afraid that ACS is at the door again.  He sometimes screams in his sleep.

201.    Ms. B brought Kyle to his doctor, who diagnosed him with anxiety.  Kyle insisted on going everywhere with Ms. B because he was frightened of being home with anyone else as he felt only his mother could protect him.  He was terrified that he might be forced into a room with an ACS investigator, told that he must submit to a body check and threatened that he could be separated from his mother if he does not comply.  He would cry every morning and refuse to go to school.  Even when he finally agreed to go back to school, he begged his mother not to go to work because he felt safer knowing she could come pick him up at any time.  He took his phone with him to school and calls her from the bathroom to make sure she is there.

202.    Kyle's pediatrician recommended that Ms. B not force him to go to school and that she stay home from work to be with him.  As a result, Ms. B had to take a leave from her job.

203.    BDS informed ACS that their actions were causing Kyle serious trauma and causing him to miss school, but upon information and belief, ACS took no action to address the issue except to threaten that if he continued to miss school Ms. B could be subject to charges of educational neglect.

204.    Ms. B's neighbors complained to her landlord that they were repeatedly contacted and questioned by ACS.  Her landlord in turn complained to her that ACS was harassing the other tenants.  Ms. B has lived in the same apartment for nine years and this is the first time the landlord has had any issues with her.

205.    Moreover, ACS's harassment of Ms. B and Kyle has deprived Kyle of his right to be cared for, guided, and protected by Ms. B.  By entering their home, subjecting Kyle to body searches, and repeatedly interrogating Kyle in their home, at the CAC, and at school over Ms. B's

objections and without Ms. B's knowledge or consent, ACS has interfered with her right to make decisions about what is best for her son, and Kyle's right to have his mother—not the government—make decisions on his behalf based on his best interests.  ACS has interfered with Ms. B's educational choices for her son by repeatedly visiting his school and taking him out of class, to the point that he refused to go to school for weeks and is still frightened that ACS will remove him from class and interrogate him at any time.

206.    ACS has made it clear that it will continue to use the same aggressive investigatory tactics in violation of Plaintiffs' constitutional rights if and when new reports are made against Ms. B, even if those reports contain the same false allegations ACS has determined to be unfounded again and again.  As ACS stated to an NYPD detective less than a year ago when the detective informed ACS that there was no need to search Ms. B's home again, "We don't care. We're still coming out."

**D.     The Fourth and Fourteenth Amendments Protect Parents Like Ms. B and Children Like Kyle During Child Abuse and Neglect Investigations.**

207.    The Fourth Amendment prohibition on unreasonable searches and seizures by state officers applies in the context of civil child abuse and maltreatment investigations.

208.    For Fourth Amendment purposes, a Family Court order supported by probable cause is equivalent to a warrant.  Without a Family Court order, forcible searches conducted by child welfare agencies like ACS are unconstitutional unless supported by exigent circumstances.

209.    The FCA provides the procedure for ACS to obtain such a warrant.  ACS may seek an entry order where there is probable cause to believe that a neglected or abused child may be present in the home, or an order directing a parent to produce a child where there is reasonable

cause to suspect a child's life or health may be in danger.  FCA § 1034(2);[5] SSL § 424(6-a).

Despite these provisions, out of more than 56,000 searches conducted annually, ACS requests

fewer than 100 warrants on average.[6]

210.    Under the Due Process Clause of the Fourteenth Amendment, Ms. B has a

fundamental liberty interest in the care, custody, and management of her child.

211.    Ms. B is further accorded procedural due process protections before the

government may deprive her of the care, custody, or management of her child without her consent.

This process is normally in the form of a pre-deprivation court hearing.

**E.    ACS's Policy and Custom of Aggressive and Coercive Tactics when Conducting Investigations**

212.    ACS has a policy and custom of aggressively investigating people subject to

allegations of child abuse and neglect by employing coercive tactics—including the tactics used

against Ms. B and Kyle.  ACS caseworkers and investigators use these aggressive and coercive

tactics regardless of whether ACS knows the allegations are false.

213.    ACS's Division of Child Protection Casework Practice Requirements Manual

("Casework Manual") states that caseworkers "must visit the home to continue the safety

assessment and conduct face-to-face interviews with all children, the subject(s), parents/caretakers

and other household members."  The visit is described as a "[r]equired task."  The Casework

Manual further requires caseworkers to "[m]ake diligent efforts to gain entry to the home," and

"[m]ake persistent attempts to gain cooperation from the family."  "[S]eparate interviews with

---

[5] FCA § 1034(2)(a)(i) requires "reasonable cause to suspect that a child or children's life or health may be in danger. New York law is clear that "reasonable cause" and "probable cause" are equivalent.

[6] Eli Hager, "In Child Welfare Cases, Most of Your Constitutional Rights Don't Apply." *Propublica,* December 29, 2022, available at https://www.propublica.org/article/some-constitutional-rights-dont-apply-in-child-welfare

each of the children [in the home]," "at school or at a Child Advocacy center whenever possible," are also a required task.

214.    While emphasizing the need for caseworkers to visit homes and interview parents and children, ACS has not adequately trained its caseworkers on when they must obtain consent to enter homes and conduct these searches and interviews, the meaning of obtaining "voluntary" consent in accordance with parents' and children's constitutional rights, and when it is necessary to seek a court order prior to entering the home or seizing a child for questioning.

215.    Rather, ACS has a policy and custom of using coercive tactics to obtain consent to search homes and interview children instead of seeking a court order.  These tactics include falsely telling parents, other household members, and children that they are required to let ACS enter homes and conduct interviews, and threatening legal action, the removal of children, and continued harassment if parents refuse.  In addition, these tactics include interrogating children at their schools without parental notice or consent when access to those children's homes is denied.  ACS employs these tactics regardless of whether ACS knows that the allegations under investigation are false.

216.    On information and belief, ACS caseworkers are instructed to tell parents and caregivers under investigation that ACS is required to enter their homes and to question children in the home.  They are instructed to return to their homes and question and examine their children repeatedly over a period of months.  ACS caseworkers do not inform people under investigation that they may decline to permit a search or questioning.

217.    On information and belief, ACS caseworkers are also instructed to conduct investigations in the same manner, including the same level of persistence in gaining entry to the home and questioning the child at home or at school, regardless of whether there is a reasonable basis to pursue an investigation.

218.   ACS's widespread use of coercive tactics to search homes and interview parents and children has been documented in the media.  An October 2022 report by ProPublica stated that "[ACS] caseworkers frequently say things that are coercive and manipulative in order to get inside homes without going to a judge, according to interviews with more than three dozen former ACS workers, New York City Family Court judges, parents, children and attorneys."[7]  According to the ProPublica report, many ACS caseworkers "said they had to find ways into homes even based on anonymous or repetitive tips to the state hotline, which in some cases come from a parent's abuser, a jilted ex or a neighbor with a grudge."

219.   A 2021 report by the NYU Wagner School of Public Policy similarly found that "[i]nstead of providing parents with immediate notice of their rights, ACS demands access to the home without a warrant or court order.  Parents are often led to believe that if they do not cooperate, their children will be taken from their care."[8] This report also stated that caseworkers "often provide little information or even misinformation to parents about the scope of the government's power in order to gain access to the home, compounding the fear of family separation."[9]

220.   Other lawsuits have also alleged similar conduct by ACS, including a recent class action filed in the U.S. District Court for the Eastern District of New York alleging ACS's "widespread custom, policy, and practice of entering and searching families' homes by using coercive tactics . . . to make parents feel that they have no choice but to allow caseworkers to enter

---

[7] Eli Hager, "Police Need Warrants to Search Homes.  Child Welfare Agents Almost Never Get One." *Propublica,* October 13, 2022, available at https://www.propublica.org/article/child-welfare-search-seizure-without-warrants.

[8] Parent Legislative Action Network Coalition & Bronx Defenders, Family Court Justice: Miranda Rights for Families, NYU Wagner Sch. Pub. Pol'y at 4 (Oct. 2021), *available at* https://wagner.nyu.edu/files/nyc2025/Bronx%20Defenders_NYU%20Policy%20Project%20-%20Family%20Miranda%20-%20DRAFT.pdf

[9] *Id.* at 2.

and search their homes." *See* Complaint, *Gould v. City of New York*, No. 1:24-cv-01263 (E.D.N.Y. Feb. 20, 2024).

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Search and Seizure on January 14, 2021*
*by Defendant Ariel Semper and the City Defendants*

221.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 220 above.

222.    On January 14, 2021, at approximately 4:30 p.m., Defendant Ariel Semper, and through her, the City Defendants, conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home by falsely telling Ms. B that she was required to let them enter the home, and interrogated and physically examined Kyle, without her consent and under conditions in which Kyle reasonably believed he could not decline or leave.

223.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

224.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

225.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

226.    Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Seizure on January 14, 2021*
*by Defendant Ariel Semper and the City Defendants at CAC*

227.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 226 above.

228.    On January 14, 2021, Defendant Ariel Semper, and through her, the City Defendants, made an unconstitutional seizure of Plaintiffs when they forced them to travel to a CAC and interrogated them under conditions in which neither reasonably believed he or she could decline or leave.

229.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

230.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

231.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

232.    Because of Defendants' unreasonable seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Search on January 15, 2021*
*by Defendant Ariel Semper and the City Defendants*

233.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 232 above.

234.    On January 15, 2021, Defendant Ariel Semper, and through her, the City Defendants, conducted an unconstitutional search of Plaintiffs' home when they obtained access by falsely telling Ms. B that she was required to let them enter the home.

235.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

236.     At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

237.     Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

238.     Because of Defendants' unreasonable search, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### FOURTH CAUSE OF ACTION
#### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Search on January 25, 2021*
*by Defendant Ariel Semper and the City Defendants*

239.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 238 above.

240.     On January 25, 2021, Defendant Ariel Semper, and through her, the City Defendants, conducted an unconstitutional search of Plaintiff Ms. B when they compelled her to submit to a drug test by falsely telling her that she was required to do so.

241.     Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

242.     At all relevant times, Defendants lacked a warrant or a reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

243.     Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

244.     Because of Defendants' unreasonable search, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
*Fourth Amendment Unreasonable Search and Seizure on February 2, 2021*
*by Defendant Ariel Semper and the City Defendants*

245.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 244 above.

246.    On February 2, 2021, Defendant Ariel Semper, and through her, the City Defendants, conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home by falsely telling Ms. B that she was required to let them enter the home, and interrogated and physically examined Kyle, without her consent and under conditions in which Kyle reasonably believed he could not decline or leave.

247.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

248.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

249.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

250.    Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

**SIXTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
*Fourth Amendment Unreasonable Search and Seizure on February 25, 2021*
*by Defendant Ariel Semper and the City Defendants*

251.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 250 above.

252.    On February 25, 2021, Defendant Ariel Semper, and through her, the City Defendants, conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home by falsely telling Ms. B that she was required to let them enter the home and

interrogated and physically examined Kyle, without her consent and under conditions in which Kyle reasonably believed he could not decline or leave.

253.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

254.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

255.    Plaintiffs have no other adequate remedy at law.   Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

256.    Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
***Fourth Amendment Unreasonable Search and Seizure on March 4, 2021***
***by Defendant Ariel Semper and the City Defendants***

257.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 256 above.

258.    On March 4, 2021, Defendant Ariel Semper, and through her, the City Defendants, conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home by falsely telling Ms. B that she was required to let them enter the home and interrogated and physically examined Kyle, without her consent and under conditions in which Kyle reasonably believed he could not decline or leave.

259.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

260.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

261.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

262.    Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### EIGHTH CAUSE OF ACTION
#### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Search and Seizure on April 9, 2021*
*by Defendant Nadine Cenord and the City Defendants*

263.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 262 above.

264.    On April 9, 2021, Defendant Nadine Cenord, and through her, the City Defendants conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home by falsely telling Ms. B that she was required to let them enter the home and interrogated and physically examined Kyle, without her consent and under conditions in which Kyle reasonably believed he could not decline or leave.

265.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

266.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

267.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

268.    Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

## NINTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### *Fourth Amendment Unreasonable Search and Seizure on April 27, 2021*
### *by Defendant Nadine Cenord and the City Defendants*

269.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 268 above.

270.    On April 27, 2021, Defendant Nadine Cenord, and through her, the City Defendants, conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home by falsely telling Ms. B that she was required to let them enter the home and interrogated Kyle, without her consent and under conditions in which Kyle reasonably believed he could not decline or leave..

271.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and  searches and seizures of Plaintiffs that commenced on January 14, 2021.

272.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

273.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

274.    Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

## TENTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### *Fourth Amendment Unreasonable Search and Seizure on May 12, 2021*
### *by Defendant Nadine Cenord and the City Defendants*

275.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 274 above.

276.    On May 12, 2021, Defendant Nadine Cenord, and through her, the City Defendants, conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home without Ms. B's consent and by falsely telling Ms. B's daughter that she was required to let them

enter the home, and interrogated and physically examined Kyle, without Ms. B's consent and under conditions in which Kyle reasonably believed he could not decline or leave.

277.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

278.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

279.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

280.    Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

**ELEVENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
***Fourth Amendment Unreasonable Search on August 22, 2021***
***by Defendant Bernadet Jean-Louis and the City Defendants***

281.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 280 above.

282.    On August 22, 2021, Defendant Bernadet Jean-Louis, and through her, the City Defendants, conducted an unconstitutional search of Plaintiffs' home when they obtained access by falsely telling Ms. B that she was required to let them enter the home.

283.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

284.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

285.     Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

286.     Because of Defendants' unreasonable search, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

**TWELFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
***Fourth Amendment Unreasonable Search and Seizure on August 30, 2021***
***by Defendant Bernadet Jean-Louis and the City Defendants***

287.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 286 above.

288.     On August 30, 2021, Defendant Bernadet Jean-Louis, and through her, the City Defendants, conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home by falsely telling Ms. B that she was required to let them enter the home and interrogated and physically examined Kyle, without her consent and under conditions in which Kyle reasonably believed he could not decline or leave.

289.     Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

290.     At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

291.     Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

292.     Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### THIRTEENTH CAUSE OF ACTION
### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Search and Seizure on September 3, 2021*
*by Defendant Ariel Semper and the City Defendants*

293.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 292 above.

294.    On September 3, 2021, Defendant Ariel Semper and through her, the City Defendants, conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home by falsely telling Ms. B that she was required to let them enter the home and interrogated and physically examined Kyle, without her consent and under conditions in which Kyle reasonably believed he could not decline or leave.

295.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

296.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

297.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

298.    Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### FOURTEENTH CAUSE OF ACTION
### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Search and Seizure on September 22, 2021*
*by Defendant Bernadet Jean-Louis and the City Defendants*

299.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 298 above.

300.    On September 22, 2021, Defendant Bernadet Jean-Louis, and through her, the City Defendants, conducted an unconstitutional search and seizure when they obtained access to Plaintiffs' home by falsely telling Ms. B that she was required to let them enter the home and

interrogated and physically examined Kyle, without her consent and under conditions in which Kyle reasonably believed he could not decline or leave.

301.     Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

302.     At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

303.     Plaintiffs have no other adequate remedy at law.   Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

304.     Because of Defendants' unreasonable search and seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### FIFTEENTH CAUSE OF ACTION
### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Seizure on October 15, 2021*
*by Defendant Bernadet Jean-Louis and the City Defendants*

305.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 304 above.

306.     On October 15, 2021, Defendant Bernadet Jean-Louis, and through her, the City Defendants, conducted an unconstitutional seizure of  Kyle when they forced him to answer questions on the street under conditions in which he reasonably believed he could not decline or leave.

307.     Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

308.     At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

309.     Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

310.     Because of Defendants' unreasonable seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### SIXTEENTH CAUSE OF ACTION
#### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Search on February 6, 2022*
*by Defendant Donna McFadden and the City Defendants*

311.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 310 above.

312.     On February 6, 2022, Defendant Donna McFadden, and through her, the City Defendants, conducted an unconstitutional search of Plaintiffs' home when they obtained access without Ms. B's consent and by falsely telling Ms. B's family member that he was required to let them enter the home.

313.     Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

314.     At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

315.     Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

316.     Because of Defendants' unreasonable search, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### SEVENTEENTH CAUSE OF ACTION
#### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Seizure on February 8, 2022*
*by Defendant Ana Costa and the City Defendants*

317.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 316 above.

57

318.   On February 8, 2022, Defendant Ana Costa, and through her, the City Defendants, made an unconstitutional seizure of Kyle at his school when they forced him to answer questions in a room without Ms. B.'s knowledge or consent and under conditions in which he reasonably believed he could not decline or leave.

319.   Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

320.   At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

321.   Plaintiffs have no other adequate remedy at law.   Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

322.   Because of Defendants' unreasonable seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### EIGHTEENTH CAUSE OF ACTION
### 42 U.S.C. § 1983
***Fourth Amendment Unreasonable Seizure on February 28, 2022***
***by Defendant Ana Costa and the City Defendants***

323.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 322 above.

324.   On February 28, 2022, Defendant Ana Costa, and through her, the City Defendants, made an unconstitutional seizure of Kyle at his school when they forced him to answer questions in a room without Ms. B.'s knowledge or consent under conditions in which he reasonably believed he could not decline or leave.

325.   Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

326. At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

327. Plaintiffs have no other adequate remedy at law. Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

328. Because of Defendants' unreasonable seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

**NINETEENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
*Fourth Amendment Unreasonable Seizure on June 27, 2022*
*by Defendant Taiesha Coleman the City Defendants*

329. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 328 above.

330. On June 27, 2022, Defendant Taiesha Coleman, and through her, the City Defendants, made an unconstitutional seizure of Kyle at his school when they forced him to answer questions in a room without Ms. B.'s knowledge or consent under conditions in which he reasonably believed he could not decline or leave.

331. Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

332. At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

333. Plaintiffs have no other adequate remedy at law. Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

334. Because of Defendants' unreasonable seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### TWENTIETH CAUSE OF ACTION
### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Seizure on January 5, 2023*
*by Defendant Leydi Taveras and the City Defendants*

335.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 334 above.

336.    On January 5, 2023, Defendant Leydi Taveras, and through her, the City Defendants, made an unconstitutional seizure of  Kyle at his school when they forced him to answer questions without Ms. B.'s knowledge or consent in the guidance counselor's office under conditions in which he reasonably believed he could not decline or leave.

337.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

338.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

339.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

340.    Because of Defendants' unreasonable seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### TWENTY-FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983
*Fourth Amendment Unreasonable Seizure on January 5, 2023*
*by Defendant Leydi Taveras and the City Defendants*

341.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 340 above.

342.    On January 5, 2023, Defendant Leydi Taveras and through her, the City Defendants, made an unconstitutional seizure of Kyle at his school when, without Ms. B.'s knowledge or consent, they cornered him in a hallway and forced him to answer questions under conditions in which he reasonably believed he could not decline or leave.

343.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

344.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

345.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

346.    Because of Defendants' unreasonable seizure, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

**TWENTY-SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983**
***Fourth Amendment Unreasonable Seizure on September 12, 2023 by the City Defendants***

347.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 346 above.

348.    On September 12, 2023, the City Defendants made an unconstitutional seizure of Kyle at his school when, without Ms. B.'s knowledge or consent, they forced him to remain in a room under conditions in which he reasonably believed he could not decline or leave.

349.    Defendants' conduct constituted a part of a pattern and practice of unconstitutional searches of Plaintiffs' home and searches and seizures of Plaintiffs that commenced on January 14, 2021.

350.    At all relevant times, Defendants lacked a warrant or reasonable basis to believe that Kyle was in imminent danger such that there was not sufficient time to obtain a warrant.

351.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

**TWENTY-THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983**
*Fourteenth Amendment Substantive Due Process Violation by All Defendants*

352.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 351 above.

353.    Defendants deprived Plaintiff Ms. B. of her liberty interest in the care, management and companionship of her son, and Plaintiff Kyle of his right to be cared for, guided and protected by his mother, through their pattern and practice of aggressive and intrusive investigations of reports of child abuse and neglect that they knew to be baseless and in disregard of court orders.

354.    Defendants' conduct, including its persistent body exams of Kyle and repeated interrogations of Kyle at school on sensitive topics without his mother's knowledge or consent, shocks the contemporary conscience.

355.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

356.    Because of Defendants' violation of Plaintiffs' fundamental liberty interest, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

**TWENTY-FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
*Fourteenth Amendment Procedural Due Process Violation by All Defendants*

357.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 356 above.

358.    Defendants substantially interfered with Plaintiff Ms. B.'s interest in the care, custody, and management of Kyle, and Kyle's interest in being raised and protected by his mother without coercive state interference.

359.    Defendants violated Plaintiffs' right to procedural due process by their pattern and practice of conducting coercive interrogations of Plaintiffs and seeking physical access to Kyle over Ms. B's objection and without a pre-deprivation hearing or a court order.

360.     Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendants' actions.

361.     Because of Defendants' violation of their fundamental liberty interests, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

### TWENTY-FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Monell *Municipal Liability of Defendant City of New York*

362.     Plaintiffs re-allege and incorporates by reference paragraphs 1 through 361 above.

363.     ACS is the child welfare agency in New York City and is responsible for creating policies, customs, and usages executed by investigators and caseworkers in the course of investigations of reports of child abuse and neglect.

364.     Local governments may be liable under 42 U.S.C. § 1983 for unconstitutional actions of individual defendants executing an official policy or custom of the local government resulting in a violation of the plaintiff's rights.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

365.     Defendant City of New York, through its agent ACS, has an official policy or custom of conducting aggressive and intrusive investigations into reports of abuse and neglect even when there is no reasonable basis to believe the reports may be founded and without seeking court authorization under the FCA.

366.     During all times relevant to this action, this official policy or custom included ACS investigators and caseworkers falsely telling subjects of investigations and their family members that they were required to permit ACS to conduct home visits and interviews in connection with open investigations.  ACS investigators also interrogate children at school, without their parent's knowledge or consent and without informing children of their right to refuse questioning, under conditions an ordinary child would not feel free to leave.  ACS employs these tactics repeatedly

even when there is no probable cause to believe a child is in danger, and without regard for the harm they cause to the children involved.

367.    Defendant City of New York, through its agent ACS, also fails to train ACS caseworkers and investigators on their legal obligation to respect parents' and children's constitutional rights.  ACS caseworkers and investigators are told that they "must" visit homes and conduct separate interviews of children in connection with investigations of child abuse and neglect, without adequate training on when caseworkers and investigators must obtain consent to enter homes and conduct these searches and interviews, the meaning of obtaining "voluntary" consent in accordance with parents' and children's constitutional rights, and when it is necessary to seek a court order prior to entering the home or seizing a child for questioning.  This failure to train amounts to deliberate indifference to the rights of the persons with whom ACS caseworkers and investigators come into contact.  ACS knows that its caseworkers and investigators will confront situations in which they must seek permission to search homes and interview children— the ACS Casework Manual directs them to do so—and these situations present caseworkers and investigators with difficult choices as to when they must obtain voluntary consent and what to do when consent is not voluntarily given, which training would make less difficult.  The wrong choice by ACS caseworkers and employees in these situations will frequently lead to violations of parents' and children's constitutional rights.

368.    As such, there is a direct causal link between Defendant City of New York's policy or custom and the conduct amounting to a deprivation of Plaintiffs' constitutional rights.

369.    Plaintiffs have no other adequate remedy at law.  Absent action by this Court, Plaintiffs have no reasonable remedy to redress Defendant City of New York's actions.

370.     Because Defendant City of New York's official policy or custom resulted in a violation of their constitutional rights, Plaintiffs have suffered and will continue to suffer substantial and concrete harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that judgment be entered and that this Court grant the following relief:

1) Assuming jurisdiction over this matter;

2) Granting declaratory and injunctive relief necessary and appropriate to remedy the Defendants' violations of the Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

3) Enjoining Defendants and their agents and employees from entering and searching Plaintiffs' home without a court order supported by probable cause; and

4) Enjoining Defendants and their agents and employees from interrogating Kyle and inspecting his body without a court order supported by probable cause, including—but not limited to—by visiting Kyle at his school; and

5) Awarding Plaintiffs reasonable compensatory and punitive damages in a sum to be determined by the jury; and

6) Awarding costs, attorneys' fees, and interest; and

7) Granting any other and further relief that this Court deems just and proper.

Respectfully submitted,

CROWELL & MORING LLP

Dated: April 26, 2024
        New York, New York

By:     _/s/ Joshua Sohn_
        Joshua Sohn
        Robert A. Mantel

Daniella A. Schmidt
Hinako Gojima
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 590-5442
jsohn@crowell.com
rmantel@crowell.com
dschmidt@crowell.com
hgojima@crowell.com

BROOKLYN DEFENDER SERVICES
Jessica Marcus
Lauren Shapiro
S. Lucas Marquez
Kevin Siegel
177 Livingston St, 7th Floor
Brooklyn, NY 11201
Tel: (347) 592-2518
jmarcus@bds.org
lshapiro@bds.org
slmarquez@bds.org
ksiegel@bds.org

*Attorneys for Plaintiffs*