UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

L.B., *individually and on behalf of her minor child,* KYLE, *proceeding under a pseudonym*,

                          Plaintiff,

                 v.                               **MEMORANDUM AND ORDER**
                                                                23-CV-8501 (RPK) (JRC)

THE CITY OF NEW YORK; JESS
DANNHAUSER, *in his official capacity as Commissioner, Administration for Children's Services of the City of New York*;
ARIEL SEMPER; NADINE CENORD;
BERNADET JEAN-LOUIS; DONNA
MCFADDEN; ANA COSTA; TAIESHA
COLEMAN; and LEYDI TAVERAS,
*individually and in their official capacities as ACS Child Protective Specialists*,

                          Defendants.

-------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

      Plaintiff L.B., individually and on behalf of her minor son, proceeding under the pseudonym "Kyle," allege that the New York City Administration for Children's Services and several individual child protective specialists violated L.B.'s and Kyle's constitutional rights by subjecting them to repeated, intrusive investigations in response to anonymous, ultimately unsubstantiated complaints of child abuse. Defendants have filed a partial motion to dismiss. For the reasons that follow, defendants' motion is granted in part and denied in part.

                                                   **BACKGROUND**

      In New York, all reports of potential child abuse or neglect are received by the State Central Register for Child Abuse and Maltreatment, a toll-free hotline operated by the New York State

Department of Social Services.  N.Y. Soc. Serv. Law § 422.  In addition to accepting reports from professionals like physicians, teachers, and therapists who are mandated to report by law, the hotline accepts reports from members of the public.  *Id.* §§ 413, 422(2)(a).  Upon receipt of a report, the local child protective service agency—here, defendant New York City Administration for Children's Services ("ACS")—must initiate an investigation within twenty-four hours.  *Id.* § 424(6)(a).  As part of this investigation, ACS must attempt to conduct a home visit and conduct face-to-face interviews with the subjects of the report.  N.Y. Comp. Codes R. & Regs. tit. 18, § 432.2(b)(3)(ii)(a), (iii)(a).  If at any point during the investigation the subject of a report or a family member denies an ACS investigator access to any child residing at the home or if a child within the home cannot be located, the investigator must determine whether to seek family court intervention or take other emergency measures within twenty-four hours of the denial of access.  *Id.* § 432.2(b)(3)(ii)(a).  Within sixty days of the report, ACS must determine whether the report is "indicated"—meaning that the investigation determined that "some credible evidence of the alleged abuse or maltreatment exists," for investigations commenced on or before December 31, 2021, or that "a fair preponderance of the evidence of the alleged abuse or maltreatment exists," for investigations commenced after December 31, 2021—or "unfounded," meaning that the investigation did not uncover such evidence.  N.Y. Soc. Serv. Law §§ 412(6)–(7), 424(7).

The following facts are taken from plaintiffs' amended complaint and are assumed true for the purposes of this order.  Plaintiff L.B. is the mother of Kyle, a minor.  Am. Compl. ¶ 9 (Dkt. #37).  L.B. has been Kyle's primary caretaker and custodian since he was born, and they have lived together in the same apartment for over nine years.  *Ibid.*  L.B. also has two adult daughters.  *Ibid.*  From January 2021 to August 2023, when Kyle was between seven and nine years old, the New York hotline received approximately fourteen anonymous reports of child abuse against L.B.

*Id.* ¶ 30. The reports contained a variety of false allegations, including that L.B. lived with her children in a bar, that she permitted a partner to sexually abuse her children, that she possessed illicit drugs and machine guns in the home, and that she drugged her children to put them to sleep. *Id.* ¶¶ 31, 42, 108. Each was investigated by ACS and ultimately determined to be unfounded. *Id.* ¶¶ 30, 38.

In the course of investigating these reports, ACS investigators employed aggressive tactics to access plaintiffs' home and to interview plaintiffs. For example, investigators sometimes arrived at plaintiffs' home unannounced very early in the morning, demanding access to the home and to interview Kyle. *Id.* ¶¶ 33–34. These interviews often included physical examinations of Kyle's body to search for signs of abuse and detailed questions about drugs and sex. *Id.* ¶ 34. ACS investigators falsely told L.B. that she was required to permit them access to her home, never telling her that, without a court order, they needed her consent. *Id.* ¶ 35. Even after L.B. was told by coworkers that she was not required to permit investigators entry into her home, ACS investigators gained access by threatening to take legal action against L.B. if she did not comply. *Id.* ¶ 87. Investigators also arrived unannounced at Kyle's school, pulling him out of class to question him without L.B.'s knowledge or consent. *Id.* ¶ 36. These investigations continued even after ACS concluded internally that L.B. had been the target of multiple baseless reports, *id.* ¶¶ 82–83, 103–04, 106, and after the Kings County Family Court denied ACS a warrant to access L.B.'s home—three times—because of the pattern of baseless reports, *id.* ¶¶ 120–27, 132–38, 161–71, 189–94. These investigations left Kyle traumatized, disrupted his education, and made him fearful that he would be removed from his mother's care. *Id.* ¶¶ 34, 197–206. L.B. was also suspended, then eventually fired, from her job as a result of the repeated investigations. *Id.* ¶ 196.

3

Plaintiff filed suit in November 2023, shortly after the latest investigation—the eighth in total—was closed as unfounded. *Id.* ¶ 195; *see* Compl. (Dkt. #1). The amended complaint brings twenty-five claims, naming as defendants the individual ACS investigators who performed each of the subject investigations, Jess Dannhauser in his capacity as Commissioner of ACS, and the City of New York.

The first twenty-two counts allege unconstitutional searches and seizures in violation of the Fourth Amendment based on visits by ACS investigators to plaintiffs' home and interrogations and physical examinations of Kyle. Counts One through Ten challenge incidents between January 14, 2021 and May 12, 2021 where ACS investigators falsely told L.B. or relatives that they were required to permit investigators access to plaintiffs' home and to Kyle. Am. Compl. ¶¶ 221–80. Counts Eleven through Fifteen challenge additional searches and seizures between August 22, 2021 and October 15, 2021, which occurred after L.B. was told by coworkers that she could refuse ACS entry. *Id.* ¶¶ 281–310; *see id.* ¶ 87. Count Sixteen alleges an unconstitutional entry into plaintiffs' home on February 6, 2022 based on investigators' representations to a relative that ACS could not be denied access to plaintiffs' home. *Id.* ¶¶ 311–16. Counts Seventeen through Twenty-Two challenge seizures by ACS investigators of Kyle at school between February 8, 2022 and September 12, 2023. *Id.* ¶¶ 317–51.

Counts Twenty-Three and Twenty-Four bring claims for violations of due process. Counts Twenty-Three and Twenty-Four allege that defendants deprived L.B. "of her liberty interest in the care, management and companionship of her son" and Kyle "of his right to be cared for, guided and protected by his mother" in violation of substantive and procedural due process, respectively. *Id.* ¶¶ 352–61.

4

Finally, Count Twenty-Five asserts that the City of New York is liable for the prior claims because it "has an official policy or custom of conducting aggressive and intrusive investigations into reports of abuse and neglect even when there is no reasonable basis to believe the reports may be founded and without seeking court authorization." Am. Compl. ¶¶ 362–70. Plaintiffs seek compensatory and punitive damages as well as an injunction enjoining defendants from further entering and searching plaintiffs' home and from interviewing Kyle at school without a court order. *Id.* at 65.

Defendants move for partial dismissal of plaintiffs' amended complaint. Defs.' Mem. of L. in Supp. of Partial Mot. to Dismiss ("Defs.' Mot.") (Dkt. #40-1). Defendants move to dismiss the Fourth Amendment claims challenging searches and seizures arising after L.B. learned of her right to refuse ACS entry to her home (Counts Eleven through Fifteen) and the plaintiffs' claims for substantive and procedural due process (Counts Twenty-Three and Twenty-Four) in their entirety. *Id.* at 7–14. Defendants also move to dismiss the Fourth Amendment claims challenging allegedly unconstitutional searches and seizures other than those occurring at Kyle's school (Counts One through Sixteen) insofar as they are pressed against the City under *Monell*. *Id.* at 14–15.

## STANDARD OF REVIEW

When evaluating motion for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)). To avoid dismissal, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the complaint's

5

allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint, in other words, must plead "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. While the plausibility standard "is not akin to a 'probability requirement,'" it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

Defendants' motion to dismiss plaintiffs' substantive due process claim is granted, and their motion to dismiss plaintiffs' procedural due process claim is granted in part. Defendants' motion is denied in all other respects.

### I.   Fourth Amendment Claims

Counts Eleven through Fourteen allege that defendants violated plaintiffs' Fourth Amendment rights by searching plaintiffs' home and interrogating Kyle without a warrant on four separate occasions between August 22, 2021 and September 22, 2021. Am. Compl. ¶¶ 281–304. Count Fifteen alleges that, on October 15, 2021, defendants violated Kyle's Fourth Amendment rights by interrogating Kyle outside, on the street at a location near plaintiffs' home. *Id.* ¶¶ 305–10. Defendants move to dismiss these counts on the grounds that L.B. consented to each of these searches and seizures. Defs.' Mot. 12–14. The motion is denied.

The protections of the Fourth Amendment apply to the actions of government officials during civil child-abuse investigations. *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000). "[T]he Fourth Amendment protects against warrantless searches absent 'specifically established and well-delineated exceptions.'" *Holeman v. City of New London*, 425 F.3d 184, 191 (2d Cir. 2005) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). One such exception is "consent by the party whose property or person is to be searched." *Ibid.* "To ascertain whether

6

consent is valid, courts examine the 'totality of all the circumstances' to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (quotation marks and citation omitted). "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *Id.* at 423 (quotation marks and citation omitted).

Similarly, under the Fourth Amendment, "[a] seizure of the person . . . occurs when, taking into account all of the circumstances surrounding the encounter, the [government actor's] conduct would have communicated to a reasonable person that he was not at liberty to ignore the [official] presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (per curiam). As with the inquiry into voluntariness of consent to a search, the inquiry into whether a person was seized is an objective inquiry, examining the "the overall coercive effect of the [official] conduct." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990).

Defendants move to dismiss these counts in their entirety, arguing that L.B. voluntarily consented to the challenged actions, defeating plaintiffs' Fourth Amendment claims. Defs.' Mot. 12–14. Plaintiffs respond that, though L.B. nominally gave her consent to ACS investigators to search her home and interview Kyle, she did so only because the investigators told her that she was "required" to permit them such access and threatened to initiate legal action if she did not comply. Pls.' Mem. of L. in Opp'n to Defs.' Partial Mot. to Dismiss ("Pls.' Opp'n") 19–21 (Dkt. #40-2); Am. Compl. ¶ 33. With respect to the legality of the searches, these allegations "cut[] against a finding of voluntariness." *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 371 (S.D.N.Y. 2012). "[I]f the officers have claimed official authority to conduct the search" and "if the individual has merely acquiesced in [that] show of authority, [she] should not be found to have

7

consented." *United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir. 1980); *cf. Bumper v. North Carolina*, 391 U.S. 543, 550 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent."). Likewise, these allegations support a finding that Kyle was seized in the course of the ACS investigators' interrogations. *See Lee*, 916 F.2d at 819 (listing "language or tone indicating that compliance with the [official] was compulsory" as a factor weighing in favor of a seizure); *Phillips*, 894 F. Supp. 2d at 363 (finding a seizure adequately alleged where five-year-old child was taken out of class and told she "had to" submit to investigators' questions).

Defendants argue with respect to Counts Eleven through Fifteen specifically that the challenged searches and seizures occurred after plaintiffs allege L.B. was told by coworkers "that she could refuse to let ACS inside her apartment and did not have to cooperate with ACS." Am. Compl. ¶ 87; *see* Defs.' Mot. 13–14. Though relevant to the voluntariness inquiry, this fact is not fatal to plaintiffs' Fourth Amendment claims at the motion-to-dismiss stage when plaintiffs allege that the ACS investigators' actions conveyed the opposite impression.

Here, plaintiffs allege that, on August 22, 2021, when L.B. attempted to deny the ACS investigator access to her home based on what she had heard from her coworkers, the investigator "persisted, . . . stat[ing] that ACS was required to search the home and see Kyle" and "threatened [L.B.] that ACS would take action against her in court to get access to her home and Kyle, and that the only way to make ACS stop visiting was to let them inside the home." Am. Compl. ¶ 87. ACS investigators repeated their demands in subsequent visits, reiterating that access to the home and to Kyle was "required." *Id.* ¶¶ 95, 97, 100. L.B.'s coworkers were, like L.B., laypeople who did not work within law enforcement or child protective services, and a reasonable person in L.B.'s

8

position could very well have believed that her coworkers' legal advice was mistaken. Plaintiffs have plausibly alleged that defendants' persistent demands for access, cloaked with official authority, rendered L.B.'s subsequent consent involuntary, notwithstanding her admission that she was told by her coworkers that she could refuse. *See, e.g.*, *United States v. Isiofia*, 370 F.3d 226, 232–33, 233 n.3 (2d Cir. 2004) (affirming district court's finding that a criminal defendant's consent to a search was involuntary despite his being advised of his right to refuse where officers "demanded" the consent and threatened him with jail and deportation if he did not comply).

Defendants' motion to dismiss Counts Eleven through Fifteen is denied.

## II. Substantive Due Process Claim

Count Twenty-Three alleges that defendants violated plaintiffs' substantive due process rights by "depriv[ing] [L.B.] of her liberty interest in the care, management and companionship of her son, and Plaintiff Kyle of his right to be cared for, guided and protected by his mother, through their pattern and practice of aggressive and intrusive investigations of reports of child abuse and neglect that they knew to be baseless and in disregard of court orders." Am. Compl. ¶ 353. Specifically, plaintiffs' substantive due process claim is predicated on defendants' "persistent body exams of Kyle and repeated interrogations of Kyle at school." *Id.* ¶ 354; *see* Pls.' Opp'n 14–15. Defendants move to dismiss this claim on several grounds: that a substantive due process violation for the deprivation of a parent's interest in "care, custody, and management" requires a wholesale deprivation of custody, that the substantive due process claim is duplicative of plaintiffs' Fourth Amendment search-and-seizure claims, and that the individual defendants are protected by qualified immunity even if plaintiffs suffered a constitutional violation. Defs.' Mot. 7–10. Defendants' motion to dismiss this claim is granted.

9

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has held that this clause includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). But "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005).

Though styled as a single count, plaintiffs' complaint really brings two substantive due process claims: one on behalf of L.B., the mother, and one on behalf of Kyle, the child. The Court will analyze these separately. Beginning with L.B., "parents have a 'constitutionally protected liberty interest in the care, custody and management of their children.'" *Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999)). Parents therefore have a "substantive right under the Due Process Clause to remain together [with their children] without the coercive interference of the awesome power of the state." *Ibid.* (brackets in original) (quoting *Tenenbaum*, 193 F.3d at 600). However, "[a]lthough parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." *Ibid.* (brackets in original) (quoting *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999)).

10

"To state a claim for a violation of this substantive due process right of custody, a plaintiff must demonstrate that the state action depriving him of custody was 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (quoting *Tenenbaum*, 193 F.3d at 600). But "[w]here there is no actual loss of custody, no substantive due process claim can lie." *Id.* at 276; *accord McCaul v. Ardsley Union Free Sch. Dist.*, 514 F. App'x 1, 2 (2d Cir. 2013). Accordingly, the Second Circuit has twice affirmed the dismissal of substantive due process claims predicated on parents' interest in the "care, custody, and management" of their children where the children were subject to medical examinations in the course of a child-abuse investigation without parental consent but were not ultimately removed from their parents' custody. *See Tenenbaum*, 193 F.3d at 591, 601 (vaginal examination); *Cox*, 654 F.3d at 271, 275–76 (compelled psychiatric evaluation). Likewise, district courts in the Circuit have dismissed substantive due process claims brought by parents alleging that their children were subjected to interviews at school where no loss of custody resulted. *See Phillips*, 894 F. Supp. 2d at 378–80; *Cornigans v. Mark Country Day Sch.*, No. 03-CV-1414 (DLI) (WDW), 2006 WL 3950335, at *4–7 (E.D.N.Y. July 12, 2006), *report and recommendation adopted sub nom. J.C. v. Mark Country Day Sch.*, 2007 WL 201163 (E.D.N.Y. Jan. 23, 2007); *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 217–18 (S.D.N.Y. 2013); *Luke v. N.Y.C. Admin. for Child. Servs.*, No. 20-CV-7504 (LLS), 2020 WL 6747433, at *5–6 (S.D.N.Y. Nov. 13, 2020). Here, each investigation into L.B. was ultimately determined by ACS to be unfounded, and Kyle was never removed from L.B.'s custody. L.B. has therefore "failed to state a viable claim that any of the actions taken by Defendants violated [her] substantive due process rights, for the simple reason that [she] never lost custody of" Kyle. *Phillips*, 894 F. Supp. 2d at 380.

11

Turning now to Kyle's substantive due process claim, as the Second Circuit has held in the context of a child-abuse investigation, a claim brought on a child's behalf that that child was removed from school and subjected to a medical examination is a search-and-seizure claim arising under the Fourth Amendment. *Tenenbaum*, 193 F.3d at 600; *accord Southerland*, 680 F.3d at 143. Here, plaintiffs allege that defendants frequently intercepted Kyle at school, including by removing him from class and stopping him in the hallway, in order to interrogate him about potential abuse at home. Am. Compl. ¶¶ 116, 136, 138, 145–46, 150–51, 166–67, 194. Plaintiffs also allege that defendants subjected Kyle to intrusive physical examinations in the course of these interrogations. *See id.* ¶¶ 116, 120. Claims on behalf of Kyle challenging these actions must be analyzed under "must be analyzed under the standard appropriate to [the Fourth Amendment], not under the rubric of substantive due process." *Tenenbaum*, 193 F.3d at 600 (brackets in original) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). And in Counts One through Twenty-Two, L.B. does, in fact, bring Fourth Amendment claims on Kyle's behalf to challenge each of defendants' seizures. Any substantive due process claim on Kyle's behalf is duplicative of Kyle's Fourth Amendment claims and therefore not cognizable under the Due Process Clause.

Finally, because plaintiffs have not pleaded that their substantive due process rights were violated, they have also necessarily failed to plead a *Monell* claim against the City of New York. *See Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

Defendants' motion to dismiss Count Twenty-Three is granted.

### III. Procedural Due Process Claim

Count Twenty-Four alleges that defendants deprived plaintiffs of procedural due process by "substantially interfer[ing] with [L.B.'s] interest in the care, custody, and management of Kyle"

12

through "their pattern and practice of conducting coercive interrogations of Plaintiffs and seeking physical access to Kyle over [L.B.'s] objection and without a pre-deprivation hearing or a court order." Am. Compl. ¶¶ 358–59; *see* Pls.' Opp'n 16–17. As with the substantive due process claim, defendants move to dismiss this claim on the grounds that the procedural due process claim is duplicative of plaintiffs' Fourth Amendment search-and-seizure claims and that the individual defendants are entitled to qualified immunity. Defs.' Mot. 11–12. Defendants' motion to dismiss this claim on the grounds identified by their motion is granted in part and denied in part.

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). As on their substantive due process claim, plaintiffs invoke the fundamental liberty interest parents have in the "care, custody, and management" of their children. Am. Compl. ¶ 358; Pls.' Opp'n 16. Plaintiffs allege two ways in which L.B.'s liberty interest was infringed without appropriate process: first, via defendants' "coercive interrogations" of Kyle, and second, in their "seeking physical access" to Kyle. Am. Compl. ¶ 359; *see* Pls.' Opp'n 16–17.

Defendants argue that any procedural due process claim arising out of plaintiffs' allegations would be duplicative of the Fourth Amendment claims brought on Kyle's behalf. *See* Defs.' Mot. 11–12; Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Reply") 7 (Dkt. #40-3). But while L.B. brings certain Fourth Amendment claims in this suit on Kyle's behalf, *see* pages 6–9, 12, *supra*, plaintiffs' procedural due process claim seeks to vindicate L.B.'s own rights in the "care, custody, and management" of Kyle, *see* Pls.' Opp'n 17 ("The Amended Complaint adequately states a claim for Defendants' violation of *Ms. B's* procedural due process rights." (emphasis added)). In the context of a child-abuse investigation, the Second Circuit has analyzed Fourth Amendment claims brought on behalf of a child and procedural due process claims brought by that

13

child's parent arising from the same underlying facts separately, without dismissing the procedural due process as duplicative. *See Tenenbaum*, 193 F.3d at 593–99, 601–06; *see also McCoy v. Admin. for Children's Servs.*, No. 23-CV-3019 (HG) (SJB), 2024 WL 4344791, at *5–9 (E.D.N.Y. Sept. 30, 2024) (same). The Court accordingly denies defendants' motion to dismiss this claim on the grounds that it is duplicative of the Fourth Amendment claim.

Defendants' only other argument is that any constitutional violation is not clearly established such that qualified immunity for the individual defendants is warranted. *See* Defs.' Mot. 11–12; Defs.' Reply 7. With respect to defendants' interrogations of Kyle, the Court agrees. Plaintiffs have identified no authority suggesting that an interview of a child without parental consent in the course of a child-abuse investigation can alone violate a parent's liberty interest in the care of her children. Instead, it is clear that "an unconsented interview by [ACS], without more, does not amount to a deprivation of care or management under the Due Process Clause." *Shakir v. Derby Police Dep't*, 284 F. Supp. 3d 165, 190–91 (D. Conn. 2018) (citing cases), *rev'd on other grounds sub nom. Shakir v. Stankye*, 805 F. App'x 35 (2d Cir. 2020); *accord McCoy*, 2024 WL 4344791, at *9; *cf. Wofford v. Evans*, 390 F.3d 318, 325 (4th Cir. 2004) (holding that the Due Process Clause did not require parental notification before school officials could temporarily detain and question a student for disciplinary purposes).

Plaintiffs' claims with respect to the second category of deprivation, however, may proceed. Plaintiffs' opposition briefing clarifies that by "seeking physical access," plaintiffs challenge defendants' bodily examinations of Kyle without court order. Pls.' Opp'n 17. Plaintiffs cite two Second Circuit cases discussing parents' protected liberty interest in directing the medical care their children receive. In *van Emrik v. Chemung County Department of Social Services*, parents of a seven-month-old infant brought her to the emergency room after they noticed one of

14

her legs appeared "floppy." 911 F.2d 863, 864 (2d Cir. 1990). The infant was diagnosed with a spiral fracture. *Ibid.* The emergency room physician reported possible child abuse to the county department of social services, which began an investigation. *Id.* at 864–65. As part of its investigation, the assigned caseworker asked the hospital to perform a series of long-bone x-rays on the infant—not "to facilitate diagnosis or treatment" of the existing fracture, but rather to "to determine if there were signs of previous fractures elsewhere in the child's body that had gone undetected and had since healed." *Id.* at 865, 867. The parents were not consulted about these x-rays, nor did the caseworker obtain a court order. *Id.* at 865. The Second Circuit held that "the constitutional liberty interest of parents in the care, custody, and management of their child . . . includes a significant decision-making role concerning medical procedures sought to be undertaken by state authority upon their children." *Id.* at 867 (quotation marks and citation omitted). Accordingly, "in the absence of parental consent," the Due Process Clause requires that "x-rays of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances." *Id.* at 867.

Similarly, in *Tenenbaum v. Williams*, a child protective services caseworker, responding to a school counselor's report of potential parental sexual abuse, removed a five-year old student from school and took her to the emergency room for a gynecological medical examination. 193 F.3d at 588–90. The caseworker did not inform the parents before the examination, nor did he obtain a court order. *Id.* at 590. Relying on *van Emrik*, the Second Circuit held that the caseworker had violated the student's and her parents' due process rights by subjecting the student to a medical examination for investigative purposes. *Id.* at 597–99. Taken together, *van Emrik* and *Tenenbaum*

15

stand for the proposition that "subjecting a child to invasive investigatory medical examination in the course of an abuse investigation requires a court order absent parental consent." *Id.* at 599.

Plaintiffs argue that ACS's repeated examinations of Kyle's body constitute medical examinations implicating the rights recognized by *Tenenbaum* and *van Emrik*. *See* Pls.' Opp'n 16–17. Defendants do not engage at all with plaintiffs' arguments regarding the applicability of *Tenenbaum* and *van Emrik*. *See* Defs.' Reply 7. Because qualified immunity is an affirmative defense, "[d]efendants bear the burden of establishing qualified immunity." *Garcia v. Does*, 779 F.3d 84, 92, 97 (2d Cir. 2015). Defendants' essentially bald assertion of qualified immunity does not satisfy this burden. *See Schechter v. Comptroller of City of N.Y.*, 79 F.3d 265, 270 (2d Cir. 1996) (rejecting defendants' unsupported assertion of qualified immunity on a motion for judgment on the pleadings because "[a]ffirmative defenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy" (quotation marks, brackets, and citation omitted)).

Accordingly, defendants' motion to dismiss Count Twenty-Four is granted in part—to the extent the claim relies on defendants' interviews of Kyle—and denied in part—to the extent the claim relies on defendants' physical examinations of Kyle obtained without parental consent or court order.

## IV. *Monell* Liability

Defendants move to dismiss plaintiffs' Fourth Amendment and procedural due process claims against the City of New York on the grounds that plaintiffs have not sufficiently alleged an unconstitutional municipal policy or custom, as required by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Defs.' Mot. 14–15. Defendants argue that plaintiffs have failed to allege the existence of a "custom or policy" attributable to the City. The motion is denied.

16

"To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco*, 615 F.3d at 140 (2d Cir. 2010) (brackets and citation omitted). "A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff and others encountering those subordinates." *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 490 (E.D.N.Y. 2018); *accord Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016).

In their complaint, plaintiffs allege that ACS investigators had a practice of "falsely telling subjects of investigations and their family members that they were required to permit ACS to conduct home visits and interviews in connection with open investigations" as well as "interrogat[ing] children at school, without their parent's knowledge or consent and without informing children of their right to refuse questioning, under conditions an ordinary child would not feel free to leave." Am. Compl. ¶ 366; *see id.* ¶¶ 215–17. To prevail under the "persistent and widespread practice" theory of municipal liability, the municipality's employees' misconduct "must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Lucente v. County of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020) (quotation marks and citation omitted). Plaintiffs' complaint details no fewer than twenty instances of at least seven ACS investigators identified by name (as well as several unidentified ones) violating plaintiffs' rights

17

in the manner described. The complaint also cites an October 2022 ProPublica investigation that describes examples of ACS caseworkers coercing parents into permitting warrantless searches and interviews that closely resemble plaintiffs' allegations, concluding that "caseworkers frequently say things that are coercive and manipulative in order to get inside homes without going to a judge." Am. Compl. ¶ 218; *see* Eli Hager, *Police Need Warrants to Search Homes. Child Welfare Agents Almost Never Get One.*, ProPublica (Oct. 13, 2022), https://www.propublica.org/article/child-welfare-search-seizure-without-warrants (last visited Mar. 12, 2025); *Broomes v. City of New York*, No. 22-CV-2807 (PKC) (MMH), 2024 WL 3823031, at *11 (E.D.N.Y. Aug. 13, 2024) ("Research reports may be used to bolster *Monell* claims . . . if those reports are sufficiently connected to the specific facts of the case and are of relatively recent vintage." (quotation marks and citation omitted)). Drawing all reasonable inferences in their favor, plaintiffs have satisfied their burden at the pleading stage to plausibly allege that the individual investigators' actions in their case were part of a widespread "custom of which policymakers [at ACS] must have been aware." *Gem Fin. Serv., Inc.*, 298 F. Supp. 3d at 490.

Plaintiffs also allege that the City failed to train ACS investigators "on when caseworkers and investigators must obtain consent to enter homes and conduct these searches and interviews, the meaning of obtaining 'voluntary' consent in accordance with parents' and children's constitutional rights, and when it is necessary to seek a court order prior to entering the home or seizing a child for questioning." Am. Compl. ¶ 367; *see id.* ¶ 214. To prevail on a failure-to-train theory, plaintiffs must show (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation," (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there

18

is a history of employees mishandling the situation," and (3) "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007). Plaintiffs must also "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Buari v. City of New York*, 530 F. Supp. 3d 356, 403 (S.D.N.Y. 2021) (citing cases). Plaintiffs' allegations meet this bar—they have alleged specific deficiencies in the City's training for ACS investigators, and their allegations of a widespread practice of ACS investigators failing to obtain voluntary consent or a court order before searches, interrogations, and examinations raise a plausible inference of deliberate indifference to the need for more training on the part of the City. *See Simms v. City of New York*, 480 F. App'x 627, 631 n.4 (2d Cir. 2012) (noting that plaintiffs "can plausibly allege a § 1983 claim for municipal liability premised on a failure to train theory without having detailed knowledge of a municipality's training programs" by "alleging facts indicating a pattern of similar constitutional violations by untrained municipal employees" (brackets, quotation marks, and citation omitted)); *Buari*, 530 F. Supp. 3d 402–03 (finding failure-to-train theory plausibly alleged where plaintiff alleged police misconduct was "endemic" and that NYPD had failed to "train officers not to initiate arrests and prosecutions without probable cause, not to coerce witnesses to testify falsely, to correct false testimony, and to disclose *Brady* material"); *Felix v. City of New York*, 344 F.Supp.3d 644, 660 (S.D.N.Y. 2018) (finding failure-to-train theory plausibly alleged where plaintiff alleged NYPD officers regularly responded to mentally ill individuals but lacked crisis intervention training).

Defendants do not meaningfully dispute that plaintiffs have alleged the existence of "an official policy or custom," as required to impose *Monell* liability on the City. Instead, defendants

19

argue that plaintiffs do "not distinguish between the investigatory procedures over which the City had policymaking discretion and those . . . required by State law." Defs.' Mot. 15. True, if the official policy causing plaintiffs' constitutional injuries was required by state law, it cannot be said to constitute a municipal policy within the meaning of *Monell*. *Vives v. City of New York*, 524 F.3d 346, 353 (2d Cir. 2008). But a municipality will not escape liability if it chooses to enforce a mandatory state law "in an unconstitutional manner" not required by the state law. *Id.* at 356. The state laws identified by defendants impose an obligation on the City to investigate reports of child abuse, but they do not require ACS investigators, in the course of those investigations, to perform nonconsensual and warrantless searches, seizures, and medical examinations in violation of the Fourth and Fourteenth Amendments.

Accordingly, defendants' motion to dismiss plaintiffs' claims against the City of New York is denied.

## CONCLUSION

For the foregoing reasons, defendants' partial motion to dismiss is granted in part and denied in part. Plaintiffs' substantive due process claim is dismissed in its entirety. Plaintiffs' procedural due process claim is dismissed to the extent it relies on defendants' interviews of Kyle without parental consent. Defendants' motion is denied in all other respects.

SO ORDERED.

                                                  /s/ Rachel Kovner
                                                  RACHEL P. KOVNER
                                                  United States District Judge

Dated: March 12, 2025
       Brooklyn, New York